[No. B155574. Second Dist., Div. Two. Nov. 25, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDEE GRASSINI, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Under California Rules of Court, rules 976(b) and 976.1, only the introductory paragraphs, Facts, parts I and II of the Discussion, and the Disposition are certified for publication.

COUNSEL

Jean F. Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters and Thien Huong Tran, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ASHMANN-GERST, J.—Randee Grassini appeals from the order committing him to the Department of Mental Health for two years, based upon the determination by a jury that he is a sexually violent predator. (Welf. & Inst. Code, § 6600 et seq.)[1] He contends (1) that the trial court had a sua sponte duty to instruct the jury that, to find he was a sexually violent predator (SVP), it had to determine whether, by reason of a diagnosed mental disorder, he was a danger to the health and safety of others in that he was likely to engage in acts of sexual violence if released from custody in a secure facility; (2) that the trial court's denial of his request for outpatient commitment without exercising its discretion denied him due process; (3) that the trial court erred in overruling his objection to credibility instructions based on prior felony convictions without exercising its discretion; (4) that the California Sexually Violent Predators Act (SVPA) violates the ex post facto clause of the United States Constitution; (5) that the California SVPA violates the equal protection clause of the United States Constitution; and (6) that the delivery of CALJIC No. 17.41.1 violated his right to a fair trial and due process under the United States Constitution.

We affirm.

FACTS

On July 27, 1999, a petition was filed alleging that appellant was an SVP. At the trial on the petition, it was stipulated that appellant had been convicted of 14 sexually violent offenses against four victims, including two convictions in Nevada in 1976 and 12 convictions in California in 1986. It was also stipulated that the offenses were predatory in nature and involved substantial sexual conduct with children under the age of 14.

The Nevada convictions, sustained when appellant was 21 years old, resulted from appellant's performance of sexual acts upon a nine-year-old boy

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

for whom he was employed as a babysitter. The acts included fondling, oral copulation and anal sex and occurred every two days during a period of three or four months. After appellant's employment ended, he wrote a letter telling the boy he loved him. Appellant was sentenced to six years in prison, serving part of this period at a treatment center for mentally disordered sex offenders.

The California convictions resulted from appellant's relationship with another nine-year-old boy, with whom appellant believed he was in love. The child referred to appellant as his boyfriend. While no violence was involved with either of the boys, appellant acknowledged as to each that he cultivated the relationship and manipulated the boys. Appellant's relationship with the nine year old in California lasted from June to August 1986 and included fondling, oral copulation, and anal sex, often twice a day. At the same time he was molesting this boy, at the boy's suggestion appellant engaged in a sexual relationship with the boy's stepuncle, who was 12 years of age. After the discovery of appellant's relationship with the nine year old, appellant ran away with him, intending to take him to Mexico, until they were caught in Long Beach a few days later. Appellant also orally copulated a four-year-old boy for whom he babysat. Upon his convictions in these matters, appellant was sentenced to 26 years in prison. He requested treatment and received individual and then group therapy.

Hy Malinek, Ph.D., a clinical psychologist who had been on the Department of Mental Health SVP panel since 1996, interviewed and evaluated appellant. He diagnosed him as a chronic, male-fixed, nonexclusive pedophile, which meant that appellant was attracted to adult males as well as to children. Pedophilia is a chronic condition and a person with that condition must work on it on a daily basis, as would one who suffers from alcoholism. Dr. Malinek believed appellant's case of pedophilia was severe, because he had begun molesting boys when he was very young and because he had cognitive distortions with regard to several of his victims, perceiving them as legitimate love interests and sex partners. Because appellant engaged in frequent and substantial sexual contact with his victims, his sexual deviance was at an extreme level. Dr. Malinek also indicated that appellant suffered from polysubstance dependence, which may contribute to the commission of sexual offenses, and that he showed some characteristics of borderline personality, including two suicide attempts.

Dr. Malinek opined that appellant was likely to reoffend in a sexually violent predatory manner. Appellant scored a five on the Static-99, the latest and most accurate recidivism risk assessment instrument, indicating a medium-high risk of reconviction. However, Dr. Malinek believed that this instrument underestimated appellant's level of risk and that he actually posed a high risk. In his opinion, the factors in appellant's favor—his age, 46, his

having served substantial prison time, and his participation in therapy in prison—did not outweigh the risk factors. These risk factors included his long history of sexual offenses, his multiple victims, including, by his own statements and police reports, other boys in addition to those he was convicted of molesting, his young age at his first offense, his high level of sexual deviance, his separation from his parents before the age of 16, particularly his separation from his mother, who left him when he developed polio when he was a year and a half old, his long-term substance abuse and borderline personality traits, his unsatisfactory behavior on parole in 1981, the existence of cognitive distortions, his difficulty in establishing or maintaining a significant long-term relationship with an appropriate adult partner, and his volitional impairment. In addition, appellant had recidivated twice despite treatment. Dr. Malinek was doubtful as to the effectiveness of appellant's therapy, since appellant admitted he had manipulated his treatment in Nevada and he had received treatment before both his 1981 parole violation and his 1986 convictions. He was not aware of whether the type of treatment appellant received in Nevada was effective in reducing recidivism.

Dr. Malinek testified that, according to appellant's prison records, appellant was recognized as a highly contributing and motivated member of his therapy group, which used cognitive and relapse prevention therapy, and his therapist indicated that he had made "significant progress in gaining insight into the factors that led up to his offense, behavior." Appellant was an active participant in the ongoing special issues process group and had gained insight into victim empathy, which is important in preventing future offenses. However, although appellant claimed he no longer desired children as sexual partners, he had not had therapy since 1994 because the funding for the program ended, and he did not state to Dr. Malinek that he was practicing relapse prevention on his own. Dr. Malinek believed that although appellant had sought therapy, he had not "held on" to what he had learned.

Dr. Malinek explained that some of the tests used by Dr. Raymond Anderson, one of the psychologists testifying for the defense, were not commonly used in determining the risk of reoffending, because the right answers were often obvious and the tests could be manipulated. When Dr. Anderson had the Penile Plethysmograph (PPG) administered, appellant signed a statement indicating he would cooperate with the test. However, appellant admitted to another doctor he had tried to suppress his arousal on the PPG.[2] Although appellant claimed not to be aroused at all while taking the test, he showed a response to a slide depicting males aged 13 to 17, which

---

[2] The PPG is a physiological measure of sexual arousal which measures penile engorgement to assess sexual arousal in response to sexually explicit images depicting males and females of different ages.

in itself was not considered deviant for a male homosexual but was significant in that appellant had denied any arousal.

Jack Vognsen, Ph.D., a clinical psychologist on the Department of Mental Health SVP panel since 1997, interviewed and evaluated appellant and diagnosed him as a male-focused, nonexclusive pedophile. Appellant engaged in the full range of sexual activities with a number of his child victims, and his claim that he was in love with a nine-year-old boy and that the boy returned his love, during which they engaged in consensual sexual relations, was a cognitive distortion. Appellant manifested no present symptoms only because he had not been around any children while in prison since 1986.

Dr. Vognsen opined that appellant was likely to reoffend in a sexually violent predatory manner when he was again around children. Appellant scored a five on the Static-99 instrument, which Dr. Vognsen believed was a conservative estimator of appellant's risk of reoffending. Other factors suggesting that appellant's risk was high included that he had not grown up with both parents, his sexual offending began early and was highly deviant, including victims as young as four years of age, he had ended his outpatient therapy early and then reoffended, he was hypersexual, engaging in sex on a daily basis with some of his victims, and he had organized his lifestyle to put himself into proximity with boys and indicated that upon release he hoped to work in a museum or planetarium, which were settings in which children would be present.

Dr. Vognsen considered the circumstance that appellant had undergone relapse prevention treatment for several years. However, its potential value was undercut by the facts that appellant had not indicated that he accepted that he was a pedophile and he was not honest, in that his claim that he turned to boys because he had difficulty having relationships with men was a gross distortion in view of his reports that he had 50 to 100 adult male sex partners and multiple relationships with men. Dr. Vognsen believed that appellant's treatment either did not take hold or any benefit had diminished in the years without treatment since 1994, because appellant did not indicate he had a relapse prevention plan, such as staying away from places where children would be. He also believed that appellant evidenced some impulsivity and bad judgment both outside prison and while in prison, where he had once slashed his wrists to make his cellmate feel guilty. These factors increased his risk of reoffending. Appellant admitted he manipulated his treatment the first time he underwent therapy.

Dr. Vognsen discounted the results of Dr. Anderson's administration of the PPG to appellant because appellant did not respond highly to images of boys

and did not respond to images of men, although he stated he had found his true identity as a homosexual and had indicated he would cooperate with the test.

Appellant was called by the prosecution and testified as a prosecution witness. He was sent to live with his grandmother after he was stricken with polio, his mother left him with his father, and his father remarried and could not keep him. He was afraid to tell his family, particularly his father, that he was a homosexual. He was molested by a neighbor when he was eight years old and had his first sexual encounter with a younger boy when he was 13 years old. He obtained his first live-in babysitting job when he was 19 years old and molested that child, who was four or five years old, one time. When he was 21 years old, he began working for the family of the nine-year-old boy whom he was convicted of molesting. He manipulated the boy into orally copulating him and into anally penetrating him. After this resulted in the Nevada convictions, he spent a year and a half at a secured hospital facility where he had individual therapy sessions a couple of times each week. He did not take the therapy seriously and manipulated the therapy, admitting that he "played the game and . . . talked the talk." Although he said he had benefitted from this therapy, he admitted this was a lie. After he was paroled, he had a brief relationship with an adult male and continued with therapy, but on a less frequent basis.

He then moved to California, where he violated his parole by molesting a five-year-old boy for whom he babysat. He served jail time after his conviction of a misdemeanor based on this offense, and then was returned to prison in Nevada. Upon his release from prison in 1981, he molested two boys. He engaged in sexual relationships with men he lived with, each relationship lasting several months, and engaged in anonymous sex with 30 to 100 adult males he met in gay bathhouses. In 1986, after the end of a relationship in which he lived with an adult male lover, appellant began his relationship with the nine-year-old boy and molested two other boys, resulting in his California convictions. He believed he and the nine-year-old boy were in love with each other. He manipulated the nine year old into having sex with him and sometimes had sex with the boy more than once a day. He also manipulated the 12 year old into having sex together with him and the nine year old. He and the nine year old were going to run away to Mexico to live as boyfriends. When he was arrested with the nine year old, he told the police that he knew his conduct was against the law, but that he was in love with the boy.

Appellant testified that he was sentenced to prison and underwent sex offender therapy, having individual therapy sessions for two to three years and then attending group therapy sessions. At this point, he realized that he

would molest again if he did not get help, and he did not intend to manipulate his therapy. He learned relapse prevention skills and he learned about victim empathy. He believed he had worked on his relapse prevention issues since the therapy programs were terminated in 1994.

While in prison, appellant had long-term sexual relationships with fellow male inmates. He admitted he was a pedophile who could not be cured, but claimed he was no longer attracted to boys. He asserted that he had been taught to redirect his thoughts and to control his behavior, and he avoided placing himself in high risk situations where he would face temptation. He believed his risk of reoffending was zero because he would not allow himself to do so.

Appellant explained that he believed that he was cooperating with the PPG by withholding responses to men as well as to boys. He had been taught to repress his urges toward boys and he also withheld his responses to images of men.

He claimed that he now realized it was not "okay" to have sex with children and asserted that, if released, he planned to have a more stable lifestyle and wanted to meet an appropriate companion. He acknowledged his need for lifelong therapy because he was a pedophile. Although he previously had reoffended while he was on outpatient therapy, he had learned to take therapy seriously. He realized he needed to completely stay away from children and, if he had thoughts about boys, to actively redirect his thoughts, because these thoughts would not "just go[] away." He asserted that he was willing to take antiandrogens, known as "chemical castration," to lower his sexual drive, although he was aware of the significant potential side effects of such treatment.

Three psychologists testified for the defense. Dr. Anderson testified that his interviews and evaluation of appellant caused him to believe that appellant was a pedophile but presently did not exhibit any evidence of the preference mediated type of the disorder, and he believed that appellant was unlikely to commit another sexual violent predatory offense if he was released. Dr. Anderson believed that the Static-99 instrument overestimated appellant's risk of reoffending because appellant differed from the population of offenders who made up the study, in that appellant had received treatment, including relapse prevention therapy. Dr. Anderson acknowledged that he was not aware whether most of the tests he performed on appellant had any proven correlation with the risk of reoffending, but he believed these tests revealed a lot more about a person's psychological functioning than tests such as the Static-99 and that they established that appellant had successfully recovered as a child molester. He also based his belief that appellant had a low risk of

reoffending on appellant's improved self-confidence, his decrease in impulsivity, the fact that he would receive a life sentence if he suffered another conviction, the fact that his attraction to children was more situational than biological, and the fact that he was nonexclusive and could satisfy his sexual drive by having relations with adult males.

William Vicary, M.D., a psychiatrist and attorney specializing in forensic psychiatry who had been on the Department of Mental Health SVP panel, interviewed and evaluated appellant and diagnosed him as a pedophile whose sexual deviance was on the high end. He did not believe that appellant was likely to reoffend because of his efforts to change and improve himself while he was in prison, including taking college courses, being active in treatment and teaching other prisoners. Appellant had also agreed to take anti-androgens upon release. Dr. Vicary acknowledged that he could not be sure appellant was telling the truth, that appellant had recently exhibited problems with anger and an inability to control his impulses, including an incident at the time Dr. Vicary interviewed him, and that these were characteristics that had led him to offend in 1976, 1981 and 1986. Appellant scored a five on the Static-99 and Dr. Vicary did not think the score should be adjusted either up or down.

Beryl Davis, Ph.D., a clinical psychologist on the Department of Mental Health SVP panel since 1996, interviewed and evaluated appellant and diagnosed him as a pedophile. She had worked in Dr. Anderson's clinic and agreed with Dr. Anderson that appellant was unlikely to reoffend. She also gave appellant a five on the Static-99, but believed it overestimated his risk of reoffending due to several factors, particularly appellant's treatment in relapse prevention, which is a recently developed technique that has been shown to have a moderate effect. She oversaw the sex offender program at appellant's prison and believed he had been a "standout participant" in therapy, where he worked to overcome his cognitive distortions and learned to empathize with his victims. Dr. Davis did not believe appellant was faking his therapy this time, although she was aware he had done so in the past. She thought that his ability to suppress his responses to images during the PPG was a positive factor. She believed his self-improvement efforts made it less likely that he would reoffend, although she acknowledged there was no proven correlation between recidivism and level of education, substance abuse therapy, participation in personal growth seminars, being empathetic, or writing out a relapse prevention plan.

## DISCUSSION

I. *Sua sponte duty to instruct on necessity of custodial treatment*

Appellant contends that the trial court reversibly erred in its instruction to the jury on one of the elements which had to be proved for it to find the SVP petition true. He asserts that the trial court should have advised the jury that it had to determine whether custody in a secure facility was necessary to ensure that he was not a danger to the health and safety of others. Although we conclude that the trial court had a duty to so instruct, appellant's contention of reversible error must fail.

■ Section 6602, subdivision (a) provides that, if the trial court determines that there is probable cause to believe that the person against whom a petition has been filed is likely to engage in sexually violent predatory criminal behavior upon his release, a trial shall be conducted. The purpose of the trial is to determine "whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release from the jurisdiction of the Department of Corrections or other secure facility." (*Ibid.*)

The jury was instructed in accordance with CALJIC No. 4.19 (1998 rev.) in pertinent part as follows: "A petition for commitment has been filed with the Court alleging that [appellant] is a sexually violent predator. [¶] The term 'sexually violent predator' means a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence, and has a currently diagnosed mental disorder that makes him or her a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent predatory criminal behavior. [¶] . . . [¶] In order to prove the petition true, the petitioner must prove each of the following elements: [¶] (1) A person has been convicted of a sexually violent offense against two or more victims for which he received a determinate sentence, and [¶] (2) the person has a currently diagnosed mental disorder, and [¶] (3) the disorder makes him a danger to the health and safety of others in that it is likely that he will engage in sexually violent predatory criminal behavior."

After advising the jury that the burden was on the People to prove beyond a reasonable doubt that appellant was a sexually violent predator, and after defining reasonable doubt, the instruction concluded, "In determining whether [appellant] is a sexually violent predator, you should consider all of the evidence introduced in the case, including the prior conviction of one or more crimes previously listed for you. However, you may not find [appellant] to be a sexually violent predator based on prior offenses without [relevant] evidence of a currently diagnosed mental disorder that makes him a danger to

the health and safety of others in that it is likely that he will engage in sexually violent criminal behavior."

Appellant argues that, by failing to instruct the jury to determine whether custody in a secure facility was necessary to ensure that he was not a danger to the health and safety of others, the instruction failed to advise the jury of the general principles of law relevant to the issues raised by the evidence, in light of the statutory language in section 6602, the evidence, and constitutional principles requiring consideration of noninstitutional alternatives to involuntary confinement. We resolve this issue based on the statutory language and need not address the constitutional argument.

Section 6600, subdivision (a) defines "sexually violent predator" as "a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." As respondent points out, the Supreme Court in *People v. Roberge* (2003) 29 Cal.4th 979 [129 Cal.Rptr.2d 861, 62 P.3d 97] (*Roberge*), discussing the meaning of the term "likely" in that provision, noted that "[e]vidence of the person's amenability to voluntary treatment, if any is presented, is relevant to the ultimate determination whether the person is likely to engage in sexually violent predatory crimes if released from custody." (*Id.* at p. 988, fn. 2.)

The Supreme Court's consideration of the meaning of the term "likely" in *Roberge* was the third time it addressed that issue under the SVPA. In *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888 [119 Cal.Rptr.2d 1, 44 P.3d 949] (*Ghilotti*), it interpreted the meaning of the word in the context of the psychological evaluations required to initiate SVP proceedings under section 6601, subdivision (d), and in *Cooley v. Superior Court* (2002) 29 Cal.4th 228 [127 Cal.Rptr.2d 177, 57 P.3d 654] (*Cooley*), it interpreted the meaning of the word in the context of the probable cause hearing which precedes the trial, under section 6602, subdivision (a).

In *Ghilotti*, the court stated that "the statute appears to contemplate that the need for treatment and the need for custody are not always one and the same." (*Ghilotti, supra,* 2 Cal.4th at p. 926.) The court there pointed out that consideration during the initial evaluation of effective treatment in the community and the person's willingness to pursue such treatment could contribute to the assessment of the risk of reoffending if free of custody. The court stated, "Such a conclusion is consistent with the SVPA's other provisions for determining whether a person is, is not, remains, or is no longer an SVP, or whether he or she meets the requirements of *conditional* release

*during* a term of commitment. In each instance, the issue is the degree of danger the person presents under the circumstances contemplated, i.e., either conditional release or complete freedom without conditions. (See, e.g., §§ 6605, subd. (c), (d) . . . , 6608, subds. (a), (d). . . .)" (*Ghilotti, supra,* at pp. 927–928, fn. omitted.)

In *Cooley,* the court concluded that "a determination of the likelihood of future dangerousness at the probable cause hearing . . . must also take into account the potential SVP's amenability to voluntary treatment upon release." (*Cooley, supra,* 29 Cal.4th at p. 256.) The court there emphasized that both provisions, that governing the initial evaluation and that governing the probable cause determination, "similarly imply that the issue is whether the person is likely to reoffend *without the confinement and involuntary treatment* provided under the SVPA," and reiterated that " 'the need for treatment and the need for custody are not always one and the same.' " (*Cooley, supra,* at p. 256, quoting *Ghilotti.*) The court further stated, again quoting *Ghilotti,* that "th[e] qualifying factor [of whether the person presents a substantial danger of reoffense if released without conditions] to be applied to the dangerousness determination" is required by " 'the SVPA in general.' " (*Ibid.*)

■ Respondent argues that the " 'amenability to voluntary treatment' theory" constitutes a theory of defense and the requested language constitutes a pinpoint instruction. A pinpoint instruction relates specific evidence to the elements of the offense, highlighting a defense theory, and must be given on request, but need not be given sua sponte. (*People v. Mayfield* (1997) 14 Cal.4th 668, 778 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588].) We disagree with respondent's assertion. We conclude that, at the very least, the presence of such evidence creates a sua sponte duty in the trial court to instruct the jury that it is to determine whether custody in a secure facility is necessary to ensure that the individual is not a danger to the health and safety of others.[3]

■ The trial court is required to instruct on the general principles of law that are necessary to the jury's understanding of the case. (*Roberge, supra,* 29 Cal.4th at p. 988.) ■ The Supreme Court's statements in *Ghilotti* and in *Cooley* set forth above, together with its observation in *Roberge* that evidence of amenability to voluntary treatment, if such evidence is presented, is "relevant to the ultimate determination whether the person is likely to engage in sexually violent predatory crimes if released from custody" (*id.* at p. 988, fn. 2), indicate that this is not a matter constituting a theory of defense but is

---

[3] We need not decide whether the trial court has a sua sponte obligation to so instruct where such evidence has not been presented.

essential to the determination to be made by the trier of fact, and thus constitutes a general principle of law necessary to the jury's understanding of the case.

However, reversal is not warranted because of the trial court's failure to so instruct, even under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. Based on the evidence presented and the arguments of counsel, we conclude that the jury was adequately informed of this concept and would not have come to a different result had it been so instructed. (*People v. Catlin* (2001) 26 Cal.4th 81, 154 [109 Cal.Rptr.2d 31, 26 P.3d 357].) The prosecutor argued that appellant had not been rehabilitated and that the question for the jury was whether it believed that appellant could control his impulses if he were out of custody and children were around, which would be unlike the situation when he was incarcerated and no children were present. Defense counsel argued that appellant agreed to voluntary treatment in a nonsecure setting, including antiandrogen treatment, and that he had an effective relapse prevention plan. Counsel urged the jury to find that appellant therefore was unlikely to reoffend. Counsel argued, "He can do it on the outside under the supervision of a parole agent because of the gains he's made over the last 15 years. . . . ." Responding to the prosecutor's argument, defense counsel pointed out that Dr. Vognsen had conceded that if appellant followed his parole conditions "he would not be able to reoffend. [¶] [Dr. Vognsen] had to admit . . . he said something like the parole conditions are strict enough to protect the community's safety. [Appellant] was required to be in treatment with electronic monitoring[,] parole agents telling him where to live, et cetera. [¶] And, ladies and gentlemen, if he just steps one toe off the line, the parole agent is not going to kick back and say, oh, I'll give you another chance. He's going to find himself right back behind bars." Counsel further argued that appellant had demonstrated, by suppressing his arousal during the PPG, that he was able to use the suppression technique and he would therefore succeed if he saw a young boy when he was "out in the community."

The issue of whether appellant required custody in a secure facility to avoid reoffending was thus placed squarely before the jury. The delivery of CALJIC No. 17.42, admonishing the jury that it would be improper for it to consider "what the disposition of [appellant] may be made as a result of [its] verdict or what treatment he may receive" and that these were matters that "must not in any way influence [its] verdict," cannot reasonably have been understood by the jury as affecting its consideration of the issue before it. Indeed, the prosecutor, in closing, admonished the jury, "Essentially, you are going to be instructed by the court that it's improper for you to consider what the disposition of the respondent may be as a result of your verdict or what treatment he may receive. These matters are matters which must not in any

way influence your verdict. [¶] So, essentially, you have to disregard that[. Y]ou're only looking at whether or not [appellant] is likely to reoffend in a sexually violent predatory manner, whether he suffers from diagnoseable mental disorder, and there was a stipulation to the qualifying offenses." On this record, we conclude that there is no reasonable possibility that the jury would have arrived at a result more favorable to appellant had the language at issue been included in the instruction.

## II. *Appellant's request for outpatient commitment*

After the trial court found probable cause to believe that appellant qualified as an SVP, appellant's counsel stated that appellant would admit the petition if he could be placed immediately in an outpatient commitment, the state-supervised Conditional Release Program (CONREP), under which he would be monitored, required to attend outpatient therapy, and probably required to take antiandrogens. Counsel asserted that the trial court had inherent authority to achieve justice by providing for the least restrictive alternative appropriate to appellant's needs and those of the community. The trial court denied the request, ruling that. it had no authority to do so because the SVPA required that SVP's be confined in a secure facility for at least one year prior to the consideration of conditional release. The trial court stated, "[T]he court declines exercising its discretion if it didn't have [*sic*] the discretion, which I don't believe I have. [¶] . . . It's not an exercise of discretion. It is not a call saying bring the facts. I don't believe he is qualified for [CONREP]. I don't believe I have discretion to even do this . . . . I believe in this matter I have no discretion. [¶] If I had discretion, I might well exercise it, but I don't. I might consider it, but I don't believe the statute allows for my discretion, and so that's the ruling, that I am legally precluded from even considering it."

█ Appellant contends that the trial court's denial of his request for outpatient commitment as an alternative to institutional confinement, without exercising any discretion, resulted in his present confinement, in violation of his state and federal rights to due process. This contention is without merit.

Section 6604 provides that the court shall commit a person found to be an SVP for a two-year commitment in a secure facility designated by the Director of Mental Health. Time spent on conditional release "in a locked facility . . . located on the grounds of an institution under the jurisdiction of the Department of Corrections" counts toward the two-year period; otherwise, time spent on conditional release does not count toward that term. (*Ibid.*) Under section 6608, an SVP may petition for conditional release. Subdivision (c) of that section, however, provides that "[n]o hearing upon the petition [for outpatient status] shall be held until the person who is committed has been

under commitment for confinement and care in a facility designated by the Director of Mental Health for not less than one year from the date of the order of commitment."

Appellant argues that the statutory framework denies him due process because the purpose of the SVPA is to protect the public, and these provisions are "not narrowly tailored to protect a legitimate societal interest which infringes on the liberty of an individual in the least drastic means possible." He asserts that, consistent with due process and this court's inherent equitable powers, we should read into the statute (see § 6604) the provision that confinement and treatment for two years in a secure facility are required only for an SVP "who is likely to engage in sexually violent criminal predatory acts while in under [*sic*] supervision and treatment in the community."

The Supreme Court in *Ghilotti, supra,* 27 Cal.4th 888, addressing the issue of whether due process limits involuntary commitment to persons who are "more likely than not" to reoffend, stated that, even assuming strict scrutiny applied, "In our view, the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes (see [*Conservatorship of*] *Hofferber* [(1980) 28 Cal.3d 161,] 171–172 [167 Cal.Rptr. 854, 616 P.2d 836]; [*In re*] *Moye* (1978) 22 Cal.3d 457, 462–463 [149 Cal.Rptr. 491, 584 P.2d 1097]; *In re Franklin* (1972) 7 Cal.3d 126, 145–148 [101 Cal.Rptr. 553, 496 P.2d 465]), even if that risk cannot be assessed at greater than 50 percent. The SVPA is narrowly tailored to achieve this compelling purpose. (See *Hubbart* [*v. Superior Court* (1999) 19 Cal.4th 1138,] 1153, fn. 20 [969 P.2d 584] [(*Hubbart*)].)" (*Ghilotti, supra,* 27 Cal.4th at p. 924.)

■   Similarly, the SVPA is narrowly tailored to provide for the compelling state interests in "protection of the public and mental health treatment." (*Hubbart, supra,* 19 Cal.4th at p. 1153, fn. 20.) In *Hubbart,* the Supreme Court pointed out that "[t]he Legislature . . . evidently determined that because SVP's have committed sexually violent offenses in the past and are dangerous at the time of commitment, they should receive treatment in a secure psychiatric facility suited to addressing the special risks they present. (See §§ 6600, subd. (a) & (b), 6600.05, 6604.)" (*Hubbart, supra,* at p. 1166.) "In describing the underlying purpose [of the SVPA], the Legislature expressed concern over a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes. The Legislature indicated that to the extent such persons are currently incarcerated and readily identifiable, commitment under the SVPA

is warranted immediately upon their release from prison. The Act provides treatment for mental disorders from which they currently suffer and reduces the threat of harm otherwise posed to the public. . . . ([Stats. 1995, ch. 763,] § 1.)" (*Hubbart, supra,* at pp. 1143–1144.)

To this end, the statutory scheme provides for confinement of SVP's until they no longer pose a threat to society, thereby employing the least drastic method of attaining its purpose of the protection of society. (See *Hubbart, supra,* 19 Cal.4th at pp. 1177–1178, fn. 36 [conditional release provisions constitute less restrictive alternatives]; see also *People v. Cheek* (2001) 25 Cal.4th 894, 898 [108 Cal.Rptr.2d 181, 24 P.3d 1204] ["The [SVPA] is . . . 'designed to ensure that the committed person does not "remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness." ' "].) As the Supreme Court observed in *Hubbart*, "Various provisions seek to ensure that any commitment ordered under section 6604 does not continue in the event the SVP's condition materially improves. . . . [A]t any time the Department of Mental Health has reason to believe that a person committed under the [SVPA] 'is no longer a sexually violent predator,' judicial review of the commitment must be sought. (§ 6605, subd. (f).) If the court accepts this recommendation, the person is entitled to unconditional release and discharge." In addition, under section 6605, an SVP "shall have a current examination of his or her mental condition made at least once every year" (§ 6605, subd. (a)), and, after a finding by the court of probable cause to believe that the mental disorder has changed, the SVP shall be unconditionally released and discharged if the state fails to prove beyond a reasonable doubt at a trial that the SVP's diagnosed mental disorder "remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged." (§ 6605, subds. (d), (e); see *Hubbart, supra,* at pp. 1147–1148.)

In addition, the SVP may also obtain conditional release from confinement under sections 6607 and 6608. Under section 6607, the Director of Mental Health shall recommend conditional release in accordance with section 6608 if he or she determines that the SVP's "diagnosed mental disorder has so changed that the person is not likely to commit acts of predatory sexual violence while under supervision and treatment in the community." Under section 6608, the SVP himself or herself may petition at any time for conditional release to a community treatment program, and this may be followed by unconditional release after a year in such program. (*People v. Cheek, supra,* 25 Cal.4th at p. 902.)

We find inapposite appellant's reliance on such cases as *Conservatorship of Hofferber, supra,* 28 Cal.3d 161 and *In re Franklin, supra,* 7 Cal.3d 126, and

on section 5325.1.[4] We find no due process violation in the trial court's rejection, under the statutory scheme, of appellant's proposed plea bargain involving immediate outpatient commitment.

### III.-VI.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The order under review is affirmed.

Nott, Acting P. J., and Doi Todd, J., concurred.

On December 3, 2003, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 18, 2004.

---

[4] Section 5325.1 provides, in pertinent part, that "[p]ersons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California, unless specifically limited by federal or state law or regulations. . . . [¶] It is the intent of the legislature that persons with mental illness shall have rights including, but not limited to, the following: [¶] (a) A right to treatment services which promote the potential of the person to function independently. Treatment should be provided in ways that are least restrictive of the personal liberty of the individual."

[*] See footnote, *ante*, page 765.