[No. B167621. Second Dist., Div. Seven. Nov. 16, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND CALDERON, Defendant and Appellant.

## COUNSEL

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, William T. Harter and Margaret E. Maxwell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS, J.**—Appellant Raymond Calderon timely appealed from an order of the trial court finding him to be a sexually violent predator (SVP) and committing him to the custody of the State Department of Mental Health (DMH) for two years pursuant to the Sexually Violent Predators Act (SVPA). (Welf. & Inst. Code,[1] § 6600 et seq.) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 20, 1998, the Los Angeles County District Attorney filed a petition for civil commitment of appellant pursuant to the SVPA. The petition alleged appellant met the criteria as an SVP within the meaning of section 6600, subdivision (a): (1) he had two convictions for rape by force occurring on December 7 and 8, 1981; (2) he currently had a diagnosed mental disorder; and (3) he posed a danger to the health and safety of others.

Appellant demanded a jury trial during which the jury's sole task was to determine whether appellant was an SVP. At trial, five expert witnesses testified, two on behalf of the People and three on behalf of appellant.

I. *People's Case-in-chief*

A. *Dr. Steen's Testimony*

Dr. Charlene Steen, a psychologist, evaluated appellant and concluded he was an SVP. During the interview, she noted appellant showed cognitive

---

[1] All statutory references are to the Welfare and Institutions Code.

distortion. Appellant did not believe he used violence in his prior sexual offenses despite the fact he grabbed victims at knifepoint. Appellant even thought his victims "liked it or wanted it" because they did not struggle.

Dr. Steen diagnosed appellant as suffering from paraphilia not otherwise specified, a sexual disorder characterized by recurrent, intense sexually arousing fantasies, sexual urges or behaviors. This assessment was based on the following facts: (1) appellant's admission that he sexually abused a younger sister when he was a child; (2) his conviction of two rapes and an attempted rape all in 1981; (3) his attack on a female staff member while being treated in Patton State Hospital in 1984; and (4) his repeated exhibitionism and masturbation in front of female staff throughout his incarcerations. Dr. Steen opined a 1979 brain injury caused appellant to be more impulsive. Dr. Steen believed appellant's conduct in and out of custody predisposed him to reoffend.

Dr. Steen also diagnosed appellant as suffering from two substance abuse disorders, which disinhibited behavior and impacted appellant's likelihood to reoffend. Dr. Steen further diagnosed appellant as suffering from a personality change caused by his brain injury and an antisocial personality disorder resulting in his impulsive behavior.

Appellant's disorders together with his brain damage led Dr. Steen to opine that appellant had a severe impulse control problem which would make him "dangerous for a very, very long time." Dr. Steen concluded appellant required treatment with close clinical supervision. As to appellant's amenability to treatment, Dr. Steen observed appellant was not "motivated to get into a treatment program on the outside himself."

### B. *Dr. Inman's Testimony*

Dr. Debra Inman, a psychologist, evaluated appellant and concluded he was an SVP. She diagnosed appellant as suffering from a personality change due to his brain injury, polysubstance dependencies, and an antisocial personality disorder. Dr. Inman attributed appellant's constant masturbation and exhibitionism to his head trauma. Dr. Inman believed these conditions intensely affected appellant's emotional and volitional capacity, thus making appellant a menace to society.

## II. *Defense*

### A. *Dr. Kowell's Testimony*

Dr. Arthur Kowell, a neurologist, evaluated appellant. Dr. Kowell placed tremendous emphasis on appellant's 1979 brain injury. He found appellant, as

a result of the brain damage, had trouble seeing, hearing, speaking, walking and memorizing. Dr. Kowell also found evidence of Kulver-Bucy Syndrome, a neurological disorder resulting in hypersexual behavior.

Dr. Kowell believed appellant had not received proper treatment for his brain injury while being housed in Patton State Hospital. Dr. Kowell testified on his planned course of treatment for appellant.

### B. *Dr. Castellano's Testimony*

Dr. Vianne Castellano, a forensic psychologist, evaluated appellant and concluded his problem was primarily caused by his head trauma, mainly in the form of organic brain syndrome. Dr. Castellano testified appellant's brain injury produced a receptive language disorder, an overall disorganization of his behavior, and a variation of Kulver-Bucy Syndrome, which resulted in discrete hypersexual behaviors. Appellant's brain damage was also responsible for his constant masturbation and exhibitionism.

Dr. Castellano diagnosed appellant as suffering from dementia evidenced by memory impairment, poor impulse control, language disturbance, impaired motor activities, and a disturbance in executive functioning, etc. She dismissed a diagnosis of paraphilia as "too narrow" because "[appellant] basically would have a hard time doing really goal directed behavior of a volitional nature."

Dr. Castellano was precluded by the trial court from testifying that, in her opinion, "the best disposition of [appellant's] case was to put him under a conservatorship under the Welfare and Institutions Code and that he could be treated in a secure nursing facility." However, Dr. Castellano did testify that appellant's organic brain syndrome could be successfully treated and that he had not received appropriate treatment for his organic brain injury while being held at Patton State Hospital.

### C. *Dr. Anderson's Testimony*

Dr. Raymond Anderson, a clinical psychologist, evaluated appellant. Dr. Anderson disagreed with Dr. Steen that appellant was predisposed to commit sexually violent offenses including rape. Rather, Dr. Anderson concluded appellant's likelihood of reoffense was low, but he was not certain of his prediction.

Dr. Anderson disputed Dr. Steen's diagnosis of paraphilia not otherwise specified and opined that appellant's rapes were the product of drug abuse and organic impulsivity rather than a persistent disorder.

During the trial, Dr. Anderson was precluded by the trial court from testifying about the type of treatment and structured placement he would recommend. Neither was Dr. Anderson allowed to testify the SVPA program was, in his opinion, inappropriate for appellant. In fact, Dr. Anderson testified there was treatment available for appellant and he would be willing to treat appellant.

## III. *Procedural History*

The jury returned its verdict finding beyond a reasonable doubt that appellant was an SVP. Appellant filed a motion for a new trial claiming the trial court erroneously excluded evidence of appellant's planned course of treatment and amenability to the treatment. The court denied the motion and ordered appellant to be committed to the custody of the DMH for the statutory term of two years.

## DISCUSSION

### I. *Exclusion of Evidence*

■ The SVPA provides for the involuntary civil commitment of a specified subset of criminal offenders, following completion of their prison terms, who are deemed SVP's. (§ 6600 et seq.) Section 6600, subdivision (a)(1) defines an SVP as "a person who has been convicted of a sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

■ One's civil commitment under the SVPA depends on the finding of his or her status as an SVP in the judicial proceedings. Where the requisite SVP finding is made, "the person shall be committed for two years to the custody of the [DMH] for appropriate treatment and confinement in a secure facility." (§ 6604.) If no such finding is made, the court shall direct that the person be released unconditionally at the end of his or her prison term. (§ 6604.)

On appeal, there is no dispute over the other requirements for classification of appellant as an SVP, such as appellant's prior qualified sexual offense and his being diagnosed with a mental disorder.[2] The only controversy is the

---

[2] Although the expert witnesses did not fully agree with each other on the exact nature of the appellant's mental disorder(s), their diagnoses comply with section 6600, subdivision (c) which broadly defines a "diagnosed mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity . . . ."

dangerousness requirement, i.e. whether as a result of his diagnosed mental disorder appellant was "a danger to the health and safety of others" in terms of his likelihood of reoffense. (§ 6600, subd. (a)(1).) Appellant contends the trial court erred in excluding evidence of planned treatment recommended by his doctors and evidence of his amenability to treatment, which appellant believes are relevant to the determination of his dangerousness.

For this contention, appellant heavily relies on *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888 [119 Cal.Rptr.2d 1, 44 P.3d 949], which was decided after his trial. In *Ghilotti*, the California Supreme Court was presented the question of whether certain factors were relevant in determining the dangerousness of an SVP in his recommitment proceedings.[3] The *Ghilotti* court accepted the defendant's argument that a person's amenability to effective voluntary treatment could reduce his dangerousness to a level below what was required for commitment under the SVPA. (*Id.*, at p. 916.) Therefore, the *Ghilotti* court ruled the evaluators were allowed to consider this factor because it was relevant to whether the defendant met the criteria for commitment or recommitment as an SVP. (*Id.*, at pp. 927–928.)

Respondent does not challenge the above propositions per se. However, respondent claims the *Ghilotti* ruling is limited to evidence of the person's amenability to *voluntary* treatment, instead of *involuntary* treatment. As respondent points out, the excluded testimony challenged in the instant case does not fall within the scope of voluntary treatment as discussed in *Ghilotti*. Therefore, *Ghilotti* does not support appellant's contention. We agree with respondent.

First, the plain language of *Ghilotti* suggests the court only considered the patient's amenability to *voluntary* treatment as a relevant factor in the SVP finding process. In various portions of the opinion, the *Ghilotti* court expressly used the word "voluntary" or "voluntarily" to describe the type of treatment towards which the patient's attitude could contribute to the risk assessment of his reoffense. For example, "the person's amenability to effective *voluntary* treatment reduces below this serious level his potential danger of reoffense if free." (*People v. Superior Court (Ghilotti)*, *supra*, 27 Cal.4th at p. 916, italics added.) Or, "The evaluators must [consider whether the person] can be trusted to pursue the necessary treatment *voluntarily* upon release." (*Id.*, at p. 926, italics added.)

Second, the SVPA only implicates amenability to *voluntary* instead of *involuntary* treatment as a relevant element in finding someone an SVP. The

---

[3] After the original two-year commitment pursuant to the SVPA, the statute provides for subsequent extended commitment(s). The term, requirements and procedures applicable to recommitment(s) are the same as those of the original commitment. (§ 6604.1.)

statute expressly lists three requirements for a valid SVP finding—qualified prior sexual offense, qualified mental disorder and the dangerousness requirement. (§ 6600, subd. (a)(1).) No other element is required or relevant to make such a finding. Actually, section 6606 even states "Amenability to treatment is not required for a finding that any person is a person described in Section 6600." (§ 6606, subd. (b).) ■ The *Ghilotti* court found the dangerousness requirement can be satisfied if a person shows difficulty in controlling his volitional behavior and thus is predisposed to inflicting harm on others. (*People v. Superior Court (Ghilotti), supra,* 27 Cal.4th at p. 920.) The *Ghilotti* court further noted the fact a person is willing to pursue *voluntary* treatment suggests he has more motivation, ability and opportunity to function lawfully if free in the community despite his mental impairment. (*Id.,* at p. 921.) Therefore, the *Ghilotti* court allowed evaluators to consider the evidence of a person's amenability to *voluntary* treatment because it reflected his reduced risk of reoffense, thus making the dangerousness requirement fail. In other words, such evidence does not add to the three statutory requirements a new and independent element. It is just derivative of the dangerousness requirement as it provides a practical way to measure this otherwise abstract standard.

We now look at the challenged evidence in the instant case and conclude it could not have been admitted as evidence of amenability to *voluntary* treatment. The core of the allegedly erroneously excluded evidence, in the form of appellant's expert testimony, was the type of structured placement and supervision recommended for appellant's treatment.[4] Dr. Castellano was precluded from testifying "the best disposition of [appellant's] case was to put him under a conservatorship under the Welfare and Institutions Code and that he could be treated in a secure nursing facility." Dr. Anderson's similar testimony was also precluded by the trial judge.

■ Although *Ghilotti* and subsequent cases have never formally defined *voluntary* treatment, the *Ghilotti* court apparently intended such treatment should have certain attributes that could reflect an SVP candidate's reduced risk of recidivism. For this purpose, voluntary treatment should not be conducted in a "custodial setting which offers mandatory treatment for the

---

[4] Although appellant asserted in his brief that the trial court precluded his expert witnesses from testifying on recommended treatment per se and his amenability thereto, this assertion is not true. First, his expert witnesses did testify, though briefly, on the availability of alternative treatment for him in order to prove his SVPA commitment unnecessary. Second, the record does not reveal whether appellant's expert witnesses were actually prepared to testify on appellant's amenability to their recommended treatment. Even when arguing for the admissibility of such evidence, appellant's counsel did not mention what expert testimony was proposed in this regard. For example, whether appellant had voluntarily agreed to receive treatment, or whether appellant's mental impairment had made him incapable of voluntarily subjecting himself to treatment.

disorder." (*People v. Superior Court* (*Ghilotti*), *supra*, 27 Cal.4th at p. 895.) As opposed to involuntary treatment, voluntary treatment features an environment where the patient is "free in the community without any conditions, supervision, monitoring, or mandatory treatment in . . . custody." (*Id.*, at p. 927.)

Thus, the treatment under a conservatorship recommended by Dr. Castellano and Dr. Anderson does not constitute voluntary treatment. The conservatorship would be pursued by the Public Guardian and supervised by the court according to the Lanterman-Petris-Short Act. (§ 5350 et seq.) Such a conservatorship by its nature involves involuntary confinement and supervision. (See § 5358; *Conservatorship of Davis* (1981) 124 Cal.App.3d 313, 317–318, 324–329 [177 Cal.Rptr. 369].) Moreover, appellant's counsel conceded the Public Guardian had recommended committing appellant to "a locked structured setting," squarely contradicting *Ghilotti's* interpretation of voluntariness. In other words, the doctors' plan of treatment under conservatorship was merely an alternative form of *involuntary* treatment apart from the involuntary treatment under the SVPA. Therefore, *Ghilotti* does not support appellant's claim the expert testimonies at issue were relevant and erroneously excluded.

We also note the exclusion of the testimony properly carried out the legislative intent of the SVPA. The Legislature declared the purpose of the SVPA was to treat and confine to the custody of DMH a "small but extremely dangerous group of sexually violent predators," because they "are not safe to be at large and if released [at the conclusion of their prison terms, thus] represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence." (Stats. 1995, ch. 763, § 1, p. 5921.) They should "be confined [under the SVPA] and treated until . . . it can be determined that they no longer present a threat to society." (*Ibid.*) In *Ghilotti*, the California Supreme Court ruled in order to find someone an SVP it was not necessary that his risk of reoffending "be assessed at greater than 50 percent" because the "state has a compelling protective interest in the confinement and treatment" of such person and the "SVPA is narrowly tailored to achieve this compelling purpose." (*People v. Superior Court* (*Ghilotti*), *supra*, 27 Cal.4th at p. 924.)

If appellant were correct in replacing confinement under the SVPA with conservatorship pursuant to the Lanterman-Petris-Short Act, the protection of the community provided by the SVPA would be significantly compromised. The two schemes adopt different standards, serve different goals and afford the community a different level of security assurance. Conservatorship under the Lanterman-Petris-Short Act was designed for the "gravely disabled" and does not require a prior conviction. (§ 5008, subd. (h).) The Lanterman-Petris-Short Act does not always mandate the maximum security confinement as

does the SVPA. Also, pursuant to the Lanterman-Petris-Short Act, even if a conservatee is initially committed to a secure facility approved by court, the conservator may later transfer him to a less restrictive alternative placement without further court approval. (§ 5358, subd. (c).) In other words, the conservatorship may be a less protective scheme for both appellant and the community.

Therefore, the trial court properly excluded the testimony on the conservatorship to ensure the jury applied the SVPA in a way compliant with the legislative intent of public safety protection. We share the trial court's concern that the testimony, if admitted, might have confused and misled the jury. The jury might have found appellant not an SVP merely because appellant promised to participate in the involuntary conservatorship program, which promise is unrelated to the question presented to the jury. If no unanimous verdict could be reached finding appellant an SVP,[5] the court would have no choice but to release appellant at the end of his prison term, unconditioned on whether he would eventually be subject to the conservatorship. To avoid such a severe consequence, it has been well established that a jury should not consider what will happen as a result of its verdict. (See *People v. Rains* (1999) 75 Cal.App.4th 1165, 1171 [89 Cal.Rptr.2d 737] [SVP jury may not be informed of the consequences of its verdict].) As respondent pointed out, we should not "inject [] that type of thinking into [jurors'] minds as to what is more appropriate for [appellant], whether it's to have a conservatorship over him or, in the alternative, a civil commitment [under the SVPA]." Since the testimony at issue implicated the consequences of the jury's verdict, they also squarely contradicted the modified CALJIC No. 17.42 given by the court, which in relevant part read "In your deliberations do not discuss or consider the subject of what consequences may be imposed on the [appellant] as a result of your verdict."

We conclude the trial court acted within its discretion in excluding the aforementioned evidence due to its lack of relevance and potential for confusion. (See *People v. Diamond* (1970) 10 Cal.App.3d 798, 801 [89 Cal.Rptr. 126].)

II. *Jury Instruction*

The trial court gave the jury CALJIC No. 4.19 (1998 rev.), the standard instruction on the required findings under the SVPA. This instruction defined "sexually violent predator" using language identical to section 6600, subdivision (a)(1), and provides in relevant part as follows:

---

[5] According to section 6603 subdivision (f), a unanimous verdict is required in any jury trial under the SVPA.

"The term 'sexually violent predator' means a person who, (1) has been convicted of a sexually violent offense against two or more victims [for which he received a sentence], and (2) has a diagnosed mental disorder [that makes] him or her a danger to the health and safety of others in that it is likely he or she will engage in sexually violent predatory criminal behavior." (See § 6600, subd. (a)(1).)

Appellant contends the trial court erred in failing, sua sponte, to instruct the jury to consider whether custody in a secure facility was necessary to ensure appellant was not a danger to others. Respondent asserts the argument is waived, inasmuch as defendant agreed with the instructions given by the trial court and at no time requested an amplifying instruction to include the above mentioned content.

■ While an SVPA commitment is a civil proceeding, it also has consequences comparable to a criminal conviction, because a commitment involves a deprivation of liberty. (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1192 [124 Cal.Rptr.2d 186, 52 P.3d 116].) Therefore appellant did not waive the claimed instructional error by failing to request the instruction at trial as it affected his substantial rights. (*People v. Van Winkle* (1999) 75 Cal.App.4th 133, 139–140 [89 Cal.Rptr.2d 28].)

■ However, we conclude there is no merit to appellant's argument. The general rule is that a court fulfills its duty of instructing the jury by defining the elements of a crime in the language of the statute. (*People v. Reed* (1952) 38 Cal.2d 423, 430 [240 P.2d 590].) The rule is subject to the qualification, however, that the " 'trial court must instruct on general principles of law that are . . . necessary to the jury's understanding of the case.' " (*People v. Roberge* (2003) 29 Cal.4th 979, 988 [129 Cal.Rptr.2d 861, 62 P.3d 97].) As discussed below, we conclude the necessity of custody in a secure facility is not always necessary to the jury's understanding of an SVPA case. A case-by-case analysis is required on whether the trial court has a sua sponte duty to so instruct.

■ *People v. Grassini* (2003) 113 Cal.App.4th 765 [6 Cal.Rptr.3d 662], decided by this district, appears to be the only case on point. In *Grassini*, the court ruled that "the presence of [evidence of amenability to voluntary treatment] creates a sua sponte duty in the trial court to instruct the jury that it is to determine whether custody in a secure facility is necessary to ensure that the individual is not a danger to the health and safety of others." (*Id.*, at p. 777.) However, *Grassini* cannot be interpreted to automatically impose on trial courts a sua sponte duty of so instructing. As a careful reading of the above quote suggests, such duty is conditioned on the *presence* of evidence of amenability to voluntary treatment. The *Grassini* court made it clear, "We

need not decide whether the trial court has a sua sponte obligation to so instruct where such evidence has not been presented." (*Id.*, at p. 777, fn. 3.)

This interpretation complies with the statutory language and the general rule of the duty of the trial court in instructing the jury. The SVPA requires no other element for an SVP finding than the three requirements listed in section 6600, subdivision (a)(1). As we pointed out, the evidence of amenability to voluntary treatment is admissible because it helps to establish one of the three requirements, i.e. the dangerousness requirement. On the other hand, evidence of involuntary treatment in the community is inadmissible because it is relevant to none of the SVP requirements. We further determined, except for what is required to make the SVP finding, that the jury should not be informed as to what should happen to the defendant as a result of its verdict. Only in cases where the defendant shows amenability to voluntary treatment should the jury face a choice between involuntary SVPA commitment and voluntary treatment. And only then should the court instruct the jury, sua sponte, to decide whether custody in a secure facility is necessary to ensure that the individual is not a danger to others.

In the instant case, appellant failed to provide positive evidence in the record as to his amenability to voluntary treatment. Thus, the trial court did not have a sua sponte duty to instruct the jury on the necessity of custody in a secure facility, because the jury was exposed to no alternative of treatment in nonsecure settings. Even expert testimony for appellant indicated he might not have the volitional ability to show amenability to any voluntary treatment: "He basically would have a hard time doing goal directed behavior of a volitional nature given the physical problems." "He doesn't have memory," "he doesn't see cause-and-effect relationships." Dr. Steen testified appellant was not "motivated to get into a treatment program on the outside himself." The record shows when being involuntarily treated in Patton State Hospital in 1984, appellant attacked a female staff member.

We conclude appellant's failure to present any evidence of his amenability to voluntary treatment relieved the trial court of a sua sponte duty to modify a legally correct jury instruction and instruct on the necessity of custody in a secure facility.

## III. *Cumulative Error*

Appellant claims that the commitment must be reversed due to cumulative error. However, the trial court did not err at all. The zero effect of errors, even if multiplied, remains zero. (See *People v. Loewen* (1983) 35 Cal.3d 117, 129 [196 Cal.Rptr. 846, 672 P.2d 436].)

## IV. *Ex Post Facto*

Appellant's first constitutional contention is that the SVPA violates the ex post facto clause of the United States Constitution. We conclude the SVPA does not violate this constitutional principle.

Appellant did not waive this constitutional issue by first raising it on appeal. (Cf. *Curry v. Superior Court* (1970) 2 Cal.3d 707, 713 [87 Cal.Rptr. 361, 470 P.2d 345] [defendant's failure to object does not preclude his arguing on appeal that he was deprived of his constitutional right against double jeopardy].)

This constitutional claim has been clearly resolved against appellant in *Kansas v. Hendricks* (1997) 521 U.S. 346, 369 [138 L.Ed.2d 501, 117 S.Ct. 2072] (rejecting ex post facto challenge to Kansas SVPA) and *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1175 [81 Cal.Rptr.2d 492, 969 P.2d 584] (rejecting ex post facto challenge to California SVPA).

## V. *Equal Protection*

Appellant's second constitutional contention is that the SVPA violates the equal protection clause of the United States Constitution. Again, we conclude the SVPA does not violate this constitutional principle.

The rule of equal protection under the United States Constitution guarantees that similarly situated people and groups are treated in an equal manner. (*People v. Massie* (1998) 19 Cal.4th 550, 571 [79 Cal.Rptr.2d 816, 967 P.2d 29].) Appellant's argument is that SVP's are similarly situated to mentally disordered offenders (MDO's). Based on this assumption, appellant contends, the fact the two groups are not treated the same triggers an equal protection issue.

However, appellant is wrong in assuming SVP's and MDO's are similarly situated. It has been well established that the two groups are not similarly situated in all respects. (*People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1221–1222 [106 Cal.Rptr.2d 490].) For example, the definition of mental disorder under the SVPA is less exacting than the one under the MDO commitment scheme. (*Id.*, at pp. 1217–1218.) Also, SVPA requires a finding that the person is likely to commit violent sex crimes, whereas MDO commitments require a present threat of harm. (*People v. Poe* (1999) 74 Cal.App.4th 826, 833 [88 Cal.Rptr.2d 437].)

## DISPOSITION

The order is affirmed.

Perluss, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 16, 2005.