Filed 10/10/14  In re J.B. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.B., a Person Coming Under the Juvenile Court Law. | D065811 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518437A) |
| v. | |
| JUSTIN B. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant Justin B.

Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for Defendant and Appellant Nathalie A.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Justin B. and Nathalie A. appeal an order terminating their parental rights in the juvenile dependency case of their minor son, J.B. Nathalie contends substantial evidence does not support the juvenile court's finding that the beneficial parent child relationship exception to adoption did not apply. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] Justin joins Nathalie's contention. Justin also argues that the juvenile court committed cumulative prejudicial error by not placing J.B. in the care of a relative. We conclude the evidence supports the juvenile court's finding and the juvenile court did not otherwise err. We therefore affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 11, 2012, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivision (b) on behalf of three-year-old J.B. The Agency alleged that Nathalie was unable to provide care for J.B. as a result of her abuse of heroin, methamphetamine, and other dangerous drugs. A month earlier, Nathalie had been arrested with J.B. in her car for being under the influence of drugs. She admitted to using heroin earlier that day. When Nathalie was arrested, J.B. was released to his maternal grandfather. However, the maternal grandfather was unable to care for J.B. on a long-term basis. In the weeks after her arrest, Nathalie tested positive for illegal drugs on two occasions and admitted using

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

heroin three times. The Agency further alleged that Justin had failed to protect J.B. from Nathalie's substance abuse, or been unable to do so. At the time of the petition, Justin was in local law enforcement custody. Nathalie had previously been involved in a voluntary case plan with the Agency, which she successfully completed.

The Agency concluded that J.B. had suffered, or was at substantial risk of suffering, serious physical harm as a result of his parents' inability to care for him. J.B. was detained and placed in foster care. At the detention hearing, the court found that the Agency had made a prima facie showing under section 300, subdivision (b) and ordered that J.B. be detained in out-of-home care. The court later sustained the allegations of the petition and declared J.B. a dependent of the juvenile court. At the disposition hearing, the court removed J.B. from Nathalie's custody and ordered reunification services for Nathalie and Justin. The court ordered supervised visitation for Nathalie. By that time, Justin was in state prison. The court ordered supervised visitation for Justin according to the terms of the facility in which he was incarcerated.

Justin requested that his sister, Summer B., be assessed for placement. The Agency approved her home, but it did not recommend placing J.B. there because Summer lived approximately four hours away from San Diego by car. The Agency believed such a long distance would impair visitation between Nathalie and J.B. and hinder Nathalie's ability to reunify. The juvenile court agreed and, at disposition, ordered that J.B. remain in foster care. Justin appealed the juvenile court's order. This court affirmed. (*In re J.B.* (Feb. 22, 2013, D062788) [nonpub. opn.].)

3

At the six-month review hearing, the Agency recommended that the parents' services be extended by six months. Although Nathalie had struggled with drug treatment programs early in the case, she was in good compliance with her current program. Nathalie also completed a parenting class. Justin was still incarcerated, but he remained in contact with J.B. through letters and phone calls. He had also completed 30 hours of parenting education in prison. The juvenile court determined that the parents had made some progress on their case plans and extended services.

Nathalie began unsupervised visits with J.B. one to two times per week. After six months, Nathalie began to have overnight visits with J.B. The overnight visits ended after a few weeks, however, because Nathalie allowed her fiancé, Ricky S., to participate in the visits. The Agency had previously told Nathalie that Ricky could not participate in visits because of his drug use. Nathalie returned to supervised visits with J.B. At the time, J.B. was upset that he could no longer visit Nathalie's home.

At the 12-month review hearing, the Agency recommended that the parents' services be terminated. Although Nathalie finished part of her drug treatment program, she had relapsed multiple times since the six-month review hearing. She tried several drug treatment programs but did not spend a substantial amount of time in any of them. Nathalie was not enrolled in any drug treatment program at the time of the hearing. Justin had attended several classes in prison, but he remained incarcerated. He was not expected to be released until after the 18-month date in J.B.'s case. Based on this evidence, the court found that Nathalie and Justin had not made substantial progress in

4

their case plans and terminated their reunification services. The court scheduled a selection and implementation hearing under section 366.26.

Justin filed a petition under section 388 asking that J.B. be placed with his paternal grandmother, Kathy B., rather than foster care. Justin alleged that Kathy was in a position to care for J.B. and that he would benefit by having a caretaker who is a biological relative. The court found that the petition had not stated a prima facie case of changed circumstances or that the requested relief would be in the best interests of the child. The court denied the petition.

Justin filed a notice of his intent to challenge the court's ruling setting the selection and implementation hearing. He also filed an appeal challenging the court's denial of his petition under section 388. Justin's counsel informed this court that there were no viable issues for writ review, and the case was dismissed. (*J.B. v. Superior Court* (Nov. 19, 2013, D064803).) Justin's appeal from the order denying his petition was dismissed as duplicative of his notice of intent. (*In re J.B.* (Nov. 25, 2013, D064974).)

In advance of the selection and implementation hearing, the Agency recommended that Justin and Nathalie's parental rights be terminated and adoption be ordered as J.B.'s permanent plan. The Agency opined that J.B. was highly adoptable. He was a smart, active, and engaging four-year-old child. He was healthy and developmentally on track. His foster family wanted to adopt him, and there were also 77 approved adoptive families in San Diego County willing to adopt a child with J.B.'s characteristics.

Agency reports show that Nathalie's visits with J.B. were generally frequent, pleasant, and appropriate. Nathalie usually brought food and toys for J.B. J.B. called

5

Nathalie "mommy" or "mom." J.B. normally did not show an emotional response upon seeing her, and Nathalie had to initiate physical affection. In later visits, J.B. appeared to shy away from Nathalie's hugs.

During visits, J.B. played easily with Nathalie and asked for her when he needed help. He also asked for his foster mother. J.B. sometimes asked to end the visits early because he wanted to go home (to his foster mother's house) or to Tijuana, Mexico (where he spent many weekends with his foster mother). J.B. was quick to leave when visits ended and did not display any level of distress. He often began to leave the visit without saying goodbye to Nathalie. Other times, he was distracted by other children or did not stop his play when Nathalie was leaving. However, when prompted, J.B. gave Nathalie a hug or kiss goodbye at the end of visits.

The Agency recognized "there may be some level of emotional distress if parental rights are terminated." But it believed the stability and permanence of adoption outweighed any detriment. The relationship between Nathalie and J.B. had been affected by Nathalie's drug use and her multiple arrests even before the dependency case was opened. In light of all the facts, the Agency did not believe the beneficial parent-child relationship exception to adoption applied.

At the contested selection and implementation hearing, the court considered testimony from Nathalie, Justin, and Sarah Wilson, the Agency social worker responsible

6

for J.B.'s case.[2]  Nathalie testified regarding the quality and frequency of her visits with J.B.  She explained that she sees J.B. three times per week for two hours.  When J.B. sees Nathalie, he will smile and usually give her a hug.  Sometimes J.B. is playing with his toys and does not hug her.  Nathalie brings food and books for J.B., including his favorite books about the movie *Cars*.  During visits, they read or play together.  Every time Nathalie visits J.B., he asks whether he can go home with her.  If J.B. starts to act out, Nathalie uses what she learned in her parenting classes to redirect him.  At the end of visits, Nathalie explains how long it will be until they see each other again.  Nathalie says she loves him, and he says it back.  Nathalie recalled one time, a month and a half prior, when J.B. cried at the end of her visit and wanted to go with her.  When Nathalie cannot visit, she talks with J.B. on the phone.  He asks, "Can I see you?  Can I see you today?"  Recently, J.B. told Nathalie he was upset because he heard that he would not be going home with her.  He also refused to speak to Nathalie for a few minutes because she did not know about an early birthday party thrown by J.B.'s foster mother for him.

Nathalie testified that she still lives with her fiancé Ricky.  He was in drug treatment and had been clean for approximately a month.  During J.B.'s dependency case, Nathalie gave birth to another son.  Ricky was the father.  Nathalie's second son was also the subject of an Agency petition because of her ongoing drug addiction.

---

2      These individuals' testimony was formally received in the context of two petitions under section 388 filed by Nathalie and Justin, which were heard concurrently with the selection and implementation hearing.  The parties agreed that the evidence received for the petitions should be considered by the court for the selection and implementation hearing as well.  Because the parties have not challenged the court's rulings on these petitions, we need not discuss them further.

Wilson testified that she had not seen J.B. upset when leaving Nathalie during the visits she observed. The court also received a number of Agency reports into evidence. The reports covered, among other things, the Agency's observation of Nathalie's visits with J.B.

Justin testified regarding his knowledge of J.B.'s dependency case and the services he had received while incarcerated. He had recently been released from state prison. However, at the time of the selection and implementation hearing, he had been rearrested and was in local law enforcement custody again. During the hearing, Justin's counsel informed the court that Justin had recently been married. Justin's wife, Elizabeth B., requested appointed counsel and also sought placement of J.B. with her. The court denied Elizabeth's request for an appointed attorney and referred her to the Agency for further discussion of her placement request. The court noted that J.B. had been placed in his current foster home for 18 months, so Elizabeth would be "up against that momentum that has been gained for that foster placement . . . ."

Following closing arguments, the court found that J.B. was adoptable and no exception to adoption had been established. As to Nathalie, the court found that she had maintained regular visitation with J.B. The court also found that J.B. would likely benefit from continuing his relationship with Nathalie. However, the court did not believe that Nathalie occupied a parental role. J.B. had been out of her care for 16 months, and she was incapacitated by her heroin addiction for many months before that. The court credited the Agency reports describing how J.B. sometimes requested that his visits with Nathalie be cut short. The court believed J.B. would have some initial discomfort if he

8

were not able to see Nathalie again, but that he would be able to work through it. The court determined that Nathalie had not shown a compelling reason why termination of parental rights would be detrimental. The court also determined that the beneficial parent-child relationship exception did not apply to Justin and the beneficial sibling relationship exception did not apply to Nathalie's second son.

The court therefore found that adoption was in J.B.'s best interests, terminated Justin's and Nathalie's parental rights, and ordered adoption as J.B.'s permanent plan. Justin and Nathalie appeal.

DISCUSSION

I

Nathalie challenges the court's finding that the beneficial parent-child relationship exception to adoption did not apply. "If the court determines, . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) An exception to this general rule applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child . . . ." (§ 366.26, subd. (c)(1)(B).) This exception may be found where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "The parent has the burden to show that the statutory exception applies." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)

"A parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some

9

incidental benefit to the child. . . . The relationship arises from the day-to-day interaction, companionship, and shared experiences.' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555, fn. omitted.) "In the context of the dependency scheme prescribed by the Legislature, we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

"[This] standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist . . . ." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

We review the court's finding for substantial evidence.[3] (*In re C.F., supra*, 193 Cal.App.4th at p. 553.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H., supra*, 27 Cal.App.4th at p. 576.) "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D., supra*, 70 Cal.App.4th at pp. 52-53.)

Here, the trial court found that Nathalie had consistently visited J.B. However, the court determined that her bond with J.B. was insufficiently beneficial to invoke the exception. The evidence introduced at trial supports the trial court's finding. J.B.

---

3    The Agency urges us to adopt a hybrid standard of review, applying both the substantial evidence and abuse of discretion standards, as some courts have done. (See, e.g., *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [applying such a hybrid standard].) Because Natalie argues the substantial evidence review applies, and we conclude that the juvenile court did not err under this established standard, we need not address this potential conflict. We note there will be little practical difference between the two standards in most cases. (See *In re Jasmine D., supra*, 78 Cal.App.4th at p. 1351 ["The practical differences between the two standards of review are not significant."].) Applying the hybrid standard here likewise would not alter our decision in this case.

11

separated easily from Nathalie at visits, and he asked to end some visits early so he could return to his foster mother. He did not initiate physical affection or say "I love you" without prompting. In later visits, J.B. shied away from Nathalie's hugs. When Nathalie left visits, sometimes he would not notice. J.B. would sometimes leave visits without saying goodbye to Nathalie. Moreover, J.B. got along very well with his foster mother, which demonstrates his ability to bond with other caregivers. Nathalie herself agrees that J.B.'s best interests would be served by remaining in his foster mother's care. In light of these facts, the juvenile court was entitled to find that this was not the extraordinary case where J.B. would be greatly harmed if parental rights were terminated, such that the benefits of adoption are outweighed. (See *Autumn H., supra*, 27 Cal.App.4th at p. 575.)

Nathalie points to evidence that her visits with J.B. were happy and appropriate. She maintains she acted in a parental role, providing J.B. with food and toys, engaging him in play, helping him with the bathroom, and redirecting him when he misbehaved. These actions, however, do not necessarily show that Nathalie and J.B. have such an exceptional bond that would outweigh the benefits of adoption. Moreover, while J.B. was sometimes affectionate with Nathalie, Agency reports showed that J.B. often showed no emotion at all when Nathalie arrived or left. It was reasonable for the juvenile court to find that J.B.'s lack of emotion was inconsistent with the type of bond the beneficial parent-child exception was intended to protect.

Nathalie argues that J.B.'s lack of distress at the end of visits was due to Nathalie's reassurances that they would see each other again soon. At most, however, this argument identifies conflicting inferences that may be drawn from the evidence, which we are

12

bound to resolve in favor of the judgment. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) Nathalie's argument also does not address the other evidence supporting the court's order, including J.B.'s failure to initiate affection with Nathalie and his requests to leave visits early. Substantial evidence supports the court's finding that the beneficial parent-child bond exception to adoption did not apply.

## II

Justin contends that "the juvenile court's repeated failure to place [J.B.] in a paternal relative['s] home constitutes cumulative error; the judgment should be reversed and the Agency ordered to place [J.B.] into an appropriate paternal relative['s] home based upon that cumulative error." Justin does not identify any authority applying the doctrine of cumulative error in a juvenile dependency case. However, even assuming that cumulative prejudicial error in relative placement may provide grounds for reversal of an order terminating parental rights, Justin has not shown cumulative error here.

To establish cumulative prejudicial error, Justin must identify errors to cumulate. (See *People v. Calderon* (2004) 124 Cal.App.4th 80, 93.) Justin cites three relative placement decisions in the juvenile court: Summer, the paternal aunt; Kathy, the paternal grandmother; and Elizabeth, Justin's wife. We address each in turn.

Justin initially requested that J.B. be placed with Summer. After the juvenile court denied placement, Justin appealed. This court found no error in the juvenile court's decision. (*In re J.B., supra,* D062788.) Justin repeats his contentions in that appeal again here, without acknowledging that they have already been rejected. Because Justin raises no new claim of error with respect to placement with Summer, our prior opinion finding

13

no error forecloses any argument for cumulative error based on that decision. (*In re Reno* (2012) 55 Cal.4th 428, 483 ["[C]laims previously rejected on their substantive merits— i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate."].) Justin mentions that Summer continued to express interest in adopting J.B., but he does not identify any error after the initial denial of placement.

Justin next filed a petition under section 388 requesting placement with Kathy. At the 12-month review hearing, the court found that Justin had not stated a prima facie case for placement and denied the petition. Justin notes these facts, but he does not identify any error in the court's decision.[4] Without error, there can be no cumulative error.

At the selection and implementation hearing, Justin's counsel notified the court that Justin had recently been married to Elizabeth. Elizabeth requested appointed counsel, which the court denied. Elizabeth also made a request for placement of J.B., which the court referred to the Agency. The court noted that Elizabeth would face

---

[4]     As we have explained, Justin appealed the court's decision denying his petition. His appeal was dismissed as duplicative of his prior notice of intent to challenge the court's decision, made at the same 12-month review hearing, to set a selection and implementation hearing under section 366.26. (*In re J.B.*, *supra*, D064974.) Any alleged errors made at a hearing setting a selection and implementation hearing must be challenged by writ, notice of which Justin had filed. (See *In re Merrick V.* (2004) 122 Cal.App.4th 235, 247.) In the separate writ proceedings, Justin's appellate counsel notified this court that there were no viable issues for writ review, which would include any error related to Justin's petition. (See *ibid.*) In light of counsel's representation, we dismissed the case. (*J.B. v. Superior Court*, *supra*, D064803.) In light of our conclusions, we need not address whether Justin has forfeited his ability to assert error, or may otherwise be barred from asserting error, based on this history. (See, e.g., *In re Jonathon S.* (2005) 129 Cal.App.4th 334, 340.)

14

obstacles in her request for placement, given that J.B. had been in his current placement for 18 months. Contrary to Justin's interpretation of the hearing, the court expressly declined to rule on Elizabeth's placement request: "I'm not making any rulings except that I can't grant your request for an attorney . . . ." In any event, Justin fails to identify any error in the court's handling of Elizabeth's placement request. Again, without error, there can be no cumulative error.

Citing the general preference for relative placement, Justin suggests this chain of events as a whole was somehow error. We disagree. The relative placement preference, both in specific (see § 361.3) and as a general legislative directive (see § 16000), is not a relative placement guarantee. (See *In re Joseph T.* (2008) 163 Cal.App.4th 787, 798.) At each point in dependency proceedings, many competing interests must be balanced in accordance with California's dependency statutes and case law. These interests include, but are not limited to, the relative placement preference. Justin's request for placement with Summer, for example, was denied because it would interfere with Nathalie's ability to reunite with J.B., despite the relative placement preference. The fact that Nathalie failed to reunify with J.B. does not make the court's prior placement decision erroneous. And, even if Summer were still available for foster placement, at this point J.B.'s interest in a permanent and stable home is paramount. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) That interest would not be served by reversing the juvenile court's order terminating parental rights and changing J.B.'s placement. (See *id.* at p. 326.)

To establish error, cumulative or otherwise, Justin must at least show that a specific juvenile court decision to deny relative placement was error under the statutes

and standards applicable to that decision.  Justin has not done so.  To the extent Justin believes California's dependency statutes give inadequate weight to the relative preference, or implement it ineffectually, the Legislature is the appropriate forum for his concerns.  To the extent he advocates for a change in our decisional law interpreting the relative placement preference, we are unpersuaded for the reasons we have stated.

DISPOSITION

The order is affirmed.


McCONNELL, P. J.

WE CONCUR:


BENKE, J.


NARES, J.