Filed 6/5/15  P. v. Carlin CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038403 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 210536) |
| v. | |
| ANTHONY WAYNE CARLIN, | |
| Defendant and Appellant. | |

Anthony Wayne Carlin appeals from an order committing him for an indeterminate term to the custody of the Department of Mental Health (now, the State Department of State Hospitals (DSH)). The order was entered after a bench trial in which the trial court found him to be a "sexually violent predator" (SVP) within the meaning of the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.) (SVPA).[1] Carlin contends (1) that the indeterminate commitment provisions of the SVPA violate the due process, ex post facto, and equal protection clauses of the federal constitution, (2) that section 6608, subdivision (a) violates his right to equal protection, (3) that the trial court erred by failing to consider placing him in a conditional release program, and (4) that

---

[1]     Further statutory references are to the Welfare and Institutions Code unless otherwise noted.

section 6604 violates due process because it does not include conditional release as an option at the initial SVP commitment proceeding. We affirm the order.

## I. Background

Carlin was serving a 16-year sentence for molesting 10-year-old Ethan F. when the petition to commit him as an SVP was filed in 2000. (*People v. Carlin* (2007) 150 Cal.App.4th 322, 329, 336 (*Carlin I*).) His first trial resulted in a mistrial. (*Id*. at p. 329.) He was retried in 2005, and a jury found the petition true. (*Ibid*.) This court reversed the commitment order, concluding that the prosecution's reliance on multiple hearsay to prove qualifying sexually violent offenses violated Carlin's right to due process. (*Carlin I*, at pp. 339-345.)

Carlin was retried in 2012. He waived his right to a jury trial and stipulated that he had suffered two qualifying convictions. The parties also stipulated that "although we're reverting to the 2000 petition, the state of the law currently is going to apply to the case. And that would mean that a commitment under the statute would be for the term prescribed by law, which is life with options for hearings after that . . . ."

Clinical psychologist Dr. Robert Owen and psychologist Dr. Douglas Korpi testified as experts for the prosecution at trial. Dr. Owen evaluated Carlin in 1999 and provided updated evaluations in 2000, 2003, 2004, 2006, and 2012. He diagnosed Carlin with pedophilia, sexual attraction to males, nonexclusive type. He explained that the DSM[2] states that pedophilia is a "chronic and lifelong" condition. He opined that Carlin's pedophilia was "a current mental disorder" that affected Carlin's volitional control. "I think he struggles with self-control and is overwhelmed by his deviant urges

---

[2] "Known by the acronym 'DSM,' the 'Diagnostic and Statistical Manual of Mental Disorders [is published] by the American Psychiatric Association. "The DSM-IV is recognized by the courts as a standard reference work containing a comprehensive classification and terminology of mental disorders."' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 945, fn. 16.)

at times." He noted that Carlin was also diagnosed with a personality disorder with narcissistic traits. He described Carlin as "an oppositional guy" who "doesn't like rules."

Dr. Owen testified that Carlin had an essentially "lifelong" history of molesting young boys. In 1961, he molested a 12-year-old boy on a Little League team that he coached. Carlin was 19. The next known molestation occurred in 1980, when Carlin had a sexual relationship with a 13-year-old boy with whom he "fell in love." In 1981, Carlin fondled a 12-year-old boy on a YMCA camping trip. Dr. Owen testified that "like almost every single offense, there was quite a bit of grooming going on, getting to know the boys, spending time with them, befriending them, being a trusted friend to them and to the parents . . . . He is focused on boys, and he is engaged in very predatory grooming, predatory in the sense that he's establishing this relationship and promoting it in order to have contact with the boys, ultimately sexual."

Carlin was charged with fondling another 13-year-old boy in 1982. Later that year, he was convicted for committing a lewd act on an 11-year-old boy on a camping trip. He was placed on probation, which he violated by having contact with young boys. In 1987, Carlin molested two preteen boys at a jet ski tournament. He pleaded guilty to one count of child molestation, declined sex offender treatment at the state hospital, and was sentenced to three years in prison. He was paroled in 1988. He repeatedly violated his parole and was returned to prison several times. Dr. Owen noted that "[j]ust about every . . . parole violation has a boy in it." "[H]e's out on parole, and yet he cannot stay away from boys." Carlin was paroled again in January 1990. Five months later, he was charged with molesting 10-year-old Ethan F. during an overnight trip to Great America. Carlin posted bail, failed to report to his parole officer, and absconded to Oregon. He was later arrested, convicted, and sentenced to 16 years in prison.

Carlin received a serious rules violation in prison for possessing pictures of children, books describing adults engaged in sexual activities with young boys, and a list of children's names, addresses, and physical attributes. Dr. Owen found it of "grave

concern" that Carlin had suffered arrests, convictions, and parole violations but still continued to offend. "He's in prison where it's really dangerous to be a pedophile . . . and yet he's cutting out pictures of children in underwear."

Around 2000, Carlin was transferred to Atascadero State Hospital (Atascadero), where he refused to participate in the sex offender treatment program for many years. At Atascadero and later at Coalinga State Hospital (Coalinga), he was volatile and confrontational. He received a number of rules violations, including a 2004 violation for possessing folders with pictures of nude and partially dressed boys. In 2008, staff found 470 child pornography images on Carlin's personal computer. Carlin told Dr. Owen that he looked at the images and found them arousing. He told psychologist and defense expert Dr. Brian Abbott that he had the pornography on a flash drive and on his laptop for about two months and that he masturbated to it. Dr. Owen found this incident "highly significant." "[W]e know that age is a big issue in reducing risk and sexuality in general, but here he is, a 65-year-old man, and he's looking at child pornography." "He's able to achieve an erection and masturbate while looking at illegal child pornography. . . . [¶] [I]nstead of doing the treatment, he's looking at child porn." "It's only a few years ago . . . ."

On multiple occasions in 2009 and again in 2011, hospital staff confiscated contraband from Carlin or intercepted contraband intended for him. The prohibited items included 10-inch hacksaw blades, cell phones and cell phone adapters, cash, and personal checks concealed in a "boom box." In 2011, Carlin became "very angry" when hospital staff deemed it inappropriate for his "business partner" to bring a 16-year-old boy and 8-year-old twin boys for a visit. Dr. Owen testified that Carlin "resists rules, which makes me question how he would do in the community. Would he really follow rules? Because he sure doesn't like to follow them in the state hospital."

Dr. Owen used several actuarial tools (the Static-99R, the Structured Risk Assessment, and the Psychopathy Checklist) that compared Carlin to similar offenders to

4

evaluate the statistical risk of sexually violent recidivism. Although Carlin's scores placed him in the "low" risk category, Dr. Owen opined that he posed a "substantial risk" of reoffending. He described Carlin's case as "highly unusual." He explained that the predictive accuracy of the Static-99R is limited because "it doesn't necessarily have normative groups . . . identical to the individuals we're looking at." It does not consider all known risk factors, and it scores only those incidents that resulted in convictions. Thus, it did not consider Carlin's possession of books describing adults engaging in sexual activities with young boys, his possession of child pornography, or his possession of contraband in violation of hospital rules.

Dr. Owen further explained that while age is generally viewed as a protective factor, he did not believe it reduced the risk of reoffense in Carlin's case. He found Carlin (who walked six to seven miles a day and engaged in stretching and isometrics) "pretty spry" for a 69-year-old man. He noted that the way in which Carlin committed his crimes did not require "physical virility." "He doesn't have to chase down his victims, hold them down . . . [or] anything like that. He simply has to convince them that he is a trustworthy, caring guy who has an interest in them personally and then build upon that until the sexual offense occurs." Carlin had a "very troubling history" that Dr. Owen said he could not ignore. The child pornography was "a big issue . . . , seeing the recency of that . . . ." The pornography evidenced Carlin's poor volitional control.

Dr. Owen described Coalinga's five-phase treatment program. Phase I is an introduction. Treatment begins in Phase II, where patients write their autobiographies and create time lines and behavior chains. Phase II is "an extensive phase" that "takes quite a while." In Phase III, patients practice what they learned in Phase II; they journal and begin developing a release plan. Phase IV involves continued journaling and further planning for release. Phase V requires a hearing before an offender can be released for treatment in the community under intense supervision.

5

Dr. Owen observed that if Carlin had been interested in confronting his pedophila and learning to manage it, he could have begun treatment 12 years earlier. Carlin did not begin treatment until 2010. He had been in Phase II for about two years but that was only "a start." Dr. Owen opined that "it would be reckless to interfere with the rest of the treatment, particularly since he's writing 'I'm zero risk.'" He opined that Carlin would have serious difficulty controlling his pedophilia if he were released into the community. "He's a guy who can easily put himself in high-risk situations because he believes he's not at risk." Dr. Owen commended Carlin's progress but said it was "not enough." "I think he needs to continue in the phases and continue with this whole process so he reduces his risk for reoffending."

Dr. Korpi evaluated Carlin in 2006 and updated his evaluation in 2012. He diagnosed Carlin with pedophilia, commenting that "everybody is going to agree on that." "The issue is does his . . . pedophilia create volitional disturbance." Dr. Korpi believed that it did. It was "a pretty straightforward matter" to conclude that Carlin had had trouble controlling his pedophilia "for many, many years." His volitional impairment had begun "quite early on" and had persisted through repeated arrests, treatment, and probation violations. "And whether in or out of custody, he gets in trouble with respect to his sexual impulses as recently as 2008." Dr. Korpi thus found it reasonable to conclude that Carlin's volitional impairment was "chronic," as demonstrated in 2004 when he was found in possession of pictures of young boys in their underwear, in 2008 when he was found in possession of child pornography, and in 2011 when he became angry at the denial of his request for a visit from the young boys his business partner wanted to bring to the hospital. Dr. Korpi considered Carlin's 2008 possession of child pornography particularly significant because Carlin had by then engaged in various forms of treatment. Carlin had "promised himself on countless occasions not to do such things" but nevertheless "gave in to the impulse" when the images were available.

6

Dr. Korpi gave Carlin "all five of the major actuarial measures" but considered only the Static-2002R and the Static-99 (which include age corrections) relevant in Carlin's case. Dr. Korpi testified that even those tests were "quickly becoming obsolete for this case" because there are so few 69-year-old men in the samples. Dr. Korpi testified that Carlin's "risk per actuarial measures, when we take into account age, is low to low-moderate." He overrode the actuarial instruments for five reasons: (1) because Carlin had sexually problematic behavior after age 60, (2) because his volitional incapacity was "late onset," having manifested in his 40s, (3) because "the unexpected 2008 event, pornography," demonstrated impulsivity and recklessness, (4) because "all the cognitive distortion" that was not apparent in Carlin's writings became evident when Dr. Korpi spoke to him, and (5) because the March 2011 "wheelings and dealings, the hacksaw blades and the boom box, cell phones, [and] all" indicated that Carlin was still "bucking the system." Dr. Korpi was "confident" in his opinion that Carlin posed a serious and well-founded risk of sexually reoffending. He opined that voluntary treatment or unconditional release "at this point would not be prudent, especially given . . . the two 8-year old boys and him getting angry. . . . [H]e's too . . . new to treatment to act with prudence upon being released, and he's as much risk now as he was when he began treatment."

Psychologists Dr. Richard Wollert and Dr. Brian Abbott testified as experts for the defense. Dr. Wollert reviewed Carlin's records and interviewed him. He diagnosed Carlin with pedophilia. He opined that Carlin did not fall within the statutory definition of an SVP because he had not exhibited volitional impairment for four years. Dr. Wollert did not consider possessing and masturbating to child pornography evidence of volitional impairment. He testified that Carlin's act of deleting the images weeks later showed "volitional control." Dr. Wollert also did not believe that Carlin's anger when his request to visit with his business partner's teenaged and eight-year-old twin boys manifested sexual volitional impairment. He characterized the visit as a business meeting that was

7

"derailed in a way that was not timely . . . [s]o [Carlin] got angry." Dr. Wollert conceded that he relied entirely on Carlin's version of events, that he did not ask Carlin pertinent questions, and that he did not talk to members of Carlin's treatment team about the incident. He also conceded that "it wouldn't be appropriate" if Carlin's motivation for having his treatment team approve the visit was (as Carlin told Dr. Abbott) that he wanted to show the team that he was no longer interested in boys.

Dr. Wollert scored Carlin on the revised version of the psychopathy checklist and on the Static-99R. He also used the MATS-1, an actuarial tool that he developed. He opined that Carlin did not present a serious and well-founded risk of reoffending. He criticized Drs. Owen and Korpi for considering factors not included in the Static-99R. He conceded that the most recent version of the Static-99R coding rules state that since the instrument does not address all relevant risk factors for sexual reoffense, a prudent evaluator will always consider other external factors that may influence risk in either direction.

Dr. Abbott interviewed Carlin, reviewed his hospital records, and spoke with some of his treatment providers. He opined that the Static-99R was the most accurate predictor of an SVP's risk of sexually reoffending. He admitted having frequently criticized the Static-99 and Static-99R instruments in previous testimony for, among other things, including only a small percentage of the factors that are relevant to sexually violent recidivism. He acknowledged that the Static-99R coding rules permit examiners to override the actuarial score. He also acknowledged that some SVP's with a Static-99R score of one reoffend and that some SVP's over 70 continue to molest children.

Dr. Abbott opined that Carlin did not meet the statutory definition of an SVP because his currently diagnosed mental illness did not affect his emotional or volitional capacity in a way that predisposed him to commit sexually violent offenses. He had "insufficient evidence" to indicate that Carlin's 2008 possession of child pornography reflected volitional impairment. He had "no firm evidence" that Carlin's 2011 wish to

8

visit with his business partner's 16- and eight-year-old boys showed volitional impairment. He was "not able to make a definitive opinion" about whether Carlin's "obvious interests" or "behavior that's reflecting his pedophilic interest" reflected serious difficulty controlling his behavior. He conceded that none of the treatment providers that he spoke with thought that Carlin should be unconditionally released.

The trial court found the petition true and ordered Carlin committed to the custody of the DSH for appropriate treatment and confinement in a secure facility. At that point in the proceedings, Carlin's counsel stated, "Your Honor, based upon the evidence that's been presented to the court I'm going to ask that this Court order Mr. Carlin into CONREP [Conditional Release Program] at this point based upon the fact of his age makes him a lower risk, that he can be safely monitored in the community, this would be a perfect time for Mr. Carlin to undergo that. [¶] The Court has also heard testimony with regard to how long this treatment program is: five to ten years. And Mr. Carlin . . . could be in his eighties by the time that happens. [¶] I think CONREP is a perfect opportunity for him and this Court can clearly order that."

The court responded: "[W]ith all due respect, I disagree with that. I don't disagree with your reasoning, but I checked the statute . . . section 6604, I think it's pretty clear that once I designate Mr. Carlin here as a sexual[ly] violent predator, the statute requires that I commit him to the [DSH] for their direction on how that is. [¶] . . . [A]nd so I am not going to order him into CONREP. I will order him to Coalinga [for] the [DSH] to make the distinction. [¶] I will say based on the testimony of several of the witnesses, including the People's witnesses, now Mr. Carlin does have testimony on the record by at least two doctors for the petitioner that basically said that had he been in treatment a couple years prior or if he is to continue that[,] in a very short order of time he should be returned to the court. I think that's very realistic. [¶] I encourage Mr. Carlin to continue with what he's doing because he's been doing a good job. And I would rely on that testimony, yourself and Mr. Carlin, in the future, if you want to, I

9

think it's an appropriate case that it should be returned fairly shortly based on the testimony of the petitioner's own experts. . . . [¶] But I'm going to leave it to the experts there to determine when it's feasible and when it's ready to happen there."

Carlin filed a timely notice of appeal.

## II. Discussion

### A. Due Process and Ex Post Facto

Carlin contends that the SVPA violates due process because it permits indeterminate commitment and puts the burden on him to show that he no longer qualifies as an SVP. He further contends that the SVPA is punitive in nature because it extends the period of confinement and increases his punishment, "of which parole is a form, by delaying it." He concedes that the California Supreme Court rejected similar claims in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), and he acknowledges that we are bound by that holding. (*McKee I*, at pp. 1193, 1195; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We decline to address these arguments, which Carlin raises only "so that he may seek further review of the issue in the California Supreme Court and federal courts."

### B. Equal Protection

Carlin contends that the indeterminate commitment provisions of the SVPA violate his right to equal protection. He concedes that the Court of Appeal rejected that argument in *People v. McKee* (2012) 207 Cal.App.4th 1327 (*McKee II*) but claims the case was "wrongly decided." He argues that the decision contains "three significant flaws." First, Carlin asserts that the *McKee II* court "characterized its duty as determining 'whether the People presented substantial evidence to support a reasonable inference or perception that the [SVPA's] disparate treatment of SVP's is necessary to further compelling state interest.'" He complains that "[t]his does not describe de novo

10

review.  Nor did the actual review the Court undertook satisfy the de novo standard." We reject the argument, as many other courts have done.  (E.g., *People v. McKnight* (2012) 212 Cal.App.4th 860, 864 ["McKnight's claim that the appellate court failed to independently review the trial court's determination is frivolous."]; *People v. Landau* (2013) 214 Cal.App.4th 1, 47; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1379, 1381.)

A court applying the deferential substantial evidence standard of review " 'must view the evidence in a light most favorable to [the judgment] and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576; see *Jackson v. Virginia* (1979) 443 U.S. 307, 318-320.)  That is not what the *McKee II* court did.  The court expressly stated that "McKee asserts, and we agree, that we review de novo the trial court's determination whether the Act, as amended by Proposition 83, violates his equal protection rights.  We *independently determine* whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's [mentally disordered offenders] and NGI's [persons found not guilty by reason of insanity], thereby justifying the disparate treatment of SVP's under the Act." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338, italics added.) The court rejected the prosecution's argument that it should defer to the trial court's findings of historical fact and credibility determinations.  (*Id*. at p. 1338, fn. 3.) Observing that "the trial court's statement of decision did not make any express findings regarding disputed historical facts or the credibility of certain witnesses," the court declared that it was "*in as good a position as the trial court* to decide whether the evidence presented by the People during the remand hearing satisfied their burden to justify the disparate treatment of SVP's under the Act." (*Ibid*., italics added)  The court ultimately agreed with the trial court that the prosecution had produced substantial

11

evidence to justify the disparate treatment. (*Id*. at pp. 1330-1331.) The *McKee II* court's review was plainly de novo.

The statement that Carlin quotes from *McKee II* does not compel a contrary conclusion. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1339.) The court's reference to "substantial evidence" reflects nothing more than the court's adherence to the standard the high court directed it to follow. In *McKee I*, the high court explained that "[w]hen a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body ' "has drawn reasonable inferences based on substantial evidence." ' [Citations.]" (*McKee I*, *supra*, 47 Cal.4th at pp. 1206-1207.) The *McKee II* court followed this standard.

Carlin next challenges the *McKee II* court's application of the strict scrutiny test. He argues that court's description of the test "more closely resembles the rational basis test." We disagree.

The *McKee II* court stated that " '[s]trict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment.' [Citation.] Applying the strict scrutiny standard, the state has the burden of establishing it has a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose. [Citation.] Alternatively stated, applying the strict scrutiny standard, a law 'is upheld only if it is necessary to further a compelling state interest.' [Citation.]" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1335.) The *McKee II* court plainly understood that the strict scrutiny test required the government to "show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.]" (*Id.* at p. 1349.)

Carlin contends that the *McKee II* court applied the wrong test. He faults the court for failing to analyze whether disparate treatment was necessary. He further faults the

12

court for analyzing only "whether the perception of the voters was reasonable" and not whether it was accurate. These arguments lack merit.

In *McKee I,* the high court directed the trial court to apply the equal protection principles articulated in *In re Moye* (1978) 22 Cal.3d 457 (*Moye*) and related cases to determine whether the prosecution "can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*McKee I*, *supra,* 47 Cal.4th at pp. 1208-1209.) In *Moye,* which like this case involved an equal protection challenge to a civil commitment statute, the high court articulated the strict scrutiny standard as follows: "[T]he state must establish both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest." (*Moye,* at p. 465.)

The *McKee II* court applied that standard. It independently reviewed the evidence and concluded that the prosecution had shown that the legislative distinctions between classes of persons subject to civil commitment were both reasonable and factually based. (*McKee II*, *supra,* 207 Cal.App.4th at p. 1347.) Specifically, the prosecution had shown that recidivism among SVP's as a class is more likely than among either MDO's or NGI's, that SVP's pose a greater risk to a particularly vulnerable class of victims, and that SVP's have "significantly different diagnoses" and significantly different treatment plans, compliance, and success rates than MDO's and NGI's. (*McKee II,* at p. 1347.) The court concluded that these distinctions justified the disparate treatment of SVP's, which was "necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered." (*Ibid*.) This satisfied the strict scrutiny standard.

To the extent Carlin contends that the prosecution had to show that SVP's are actually more dangerous as a class, we reject the contention. In remanding the case, the *McKee I* court stated that "the government will have an opportunity to justify Proposition

13

83's indefinite commitment provisions . . . , and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate. [¶] Moreover, we emphasize that mere disagreement among experts will not suffice to overturn the Proposition 83 amendments. The trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not whether they are incontrovertible or uncontroversial." (*McKee I, supra,* 47 Cal.4th at pp. 1210-1211, fn. omitted.) The *McKee II* court relied on evidence that scores on the Static-99 test, which assesses the risk that a sex offender will commit sex offenses, were significantly higher for SVP's than for MDO's and NGI's. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1340-1342.) It complied with the high court's directions.

Relying on *Bernal v. Fainter* (1984) 467 U.S. 216 (*Bernal*), Carlin next argues that "[t]he element of necessity under the strict scrutiny standard required that the prosecution show that the disparate treatment of SVPs constituted the least restrictive means possible." He contends that the *McKee II* court misapplied the strict scrutiny test by improperly "reject[ing] the need for the prosecution to make such a showing."

McKee made a similar argument and the *McKee II* court rejected it. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1349.) In *Bernal*, the United States Supreme Court stated that "[i]n order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available." (*Bernal*, *supra*, 467 U.S. at p. 219.) The *McKee II* court described the quoted sentence as "probable dictum" and distinguished *Bernal* because it involved a suspect class, alienage. (*McKee II*, at p. 1349.) The *McKee II* court stated, "We are unaware of any case applying the 'least restrictive means available' requirement to all cases involving disparate treatment of similarly situated classes." (*Ibid.*) "On the contrary, our review of equal protection case law shows the two-part test, as discussed in *Moye* and *McKee* [*I*], is the prevailing standard. . . . Therefore, in strict scrutiny cases, the government must show both a compelling state

14

interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest.  [Citations.]  We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered."  (*McKee II*, at p. 1349.)

We agree with the *McKee II* court's analysis.  Given the evidence presented in *McKee II* (that the vast majority of SVP's are diagnosed with pedophilia or other paraphilias, that a paraphilia ordinarily persists throughout a patient's lifetime, that treatment of SVP's is not focused on medication, and that most SVP's do not participate in treatment), we have no basis for concluding that an indeterminate term is not necessary to further the compelling state interest in providing treatment to SVP's and protecting the public or that there is any less burdensome alternative to effectuate those interests. (*McKee II*, at pp. 1344-1346.)

*Dunn v. Blumstein* (1972) 405 U.S. 330 (*Dunn*) and the other cases Carlin cites do not compel a different conclusion.  Those cases merely illustrate what Carlin expressly acknowledges:  that "[t]he strict scrutiny test has been phrased in a number of different ways including 'the least restrictive means available,' 'narrowly tailored,' and 'necessary to further.'"  As the *Dunn* court explained, using particular language to articulate the test is less important than applying the proper level of scrutiny to a challenged law.  (*Dunn*, at pp. 342-343.)  In *Dunn*, the court held that durational residence laws restricting voting rights "are unconstitutional unless the State can demonstrate that such laws are '*necessary* to promote a *compelling* governmental interest.'  [Citations.]  Thus phrased, the constitutional question may sound like a mathematical formula.  But legal 'tests' do not have the precision of mathematical formulas.  The key words emphasize a matter of degree:  that a heavy burden of justification is on the State, and that the statute will be

closely scrutinized in light of its asserted purposes." (*Ibid.*) The *McKee II* court applied the proper level of scrutiny.

Carlin challenges the *McKee II* court's conclusion that "'[t]he People presented evidence showing [that] the inherent nature of the SVP's mental disorder makes recidivism significantly more likely for SVP's as a class than for MDO's and NGI's.'" He complains that the court did not examine any evidence comparing the sexual recidivism rate of SVP's with the sexual recidivism rate of MDO's and NGI's, who are similarly situated. Instead, it compared the SVP recidivism rates with those of "other types of criminals," which was "neither useful, nor relevant." We cannot agree.

In *McKee II,* the prosecution presented studies, Static-99 data comparing recidivism rates, and the testimony of three expert witnesses. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1340-1342.) The court acknowledged that the evidence showed that "the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely than recidivism of sex offenders generally" but "d[id] not show SVP's have, in fact, a higher sexual recidivism rate than MDO's and NGI's." (*Id.* at p. 1342.) Nonetheless, the court found the recidivism rate evidence "'significant, given that the goal of the [SVPA] is specifically to protect society from particularly serious sexual offenses.'" (*Ibid.*) The court also relied on evidence that scores on the Static-99 test, which assesses the risk that a sex offender will commit new sex offenses, were higher for SVP's than for non-SVP sex offenders. (*Ibid.*) The court held that "[r]egardless of the shortcomings or inadequacy of the evidence on actual sexual recidivism rates, the Static-99 evidence . . . supports, by itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's." (*Ibid.*) The *McKee II* court's conclusion was consistent with the *McKee I* court's suggestion that evidence of a greater risk of recidivism by SVP's was one type of evidence that the prosecution might present to show that "notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to

16

society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*McKee I*, *supra*, 47 Cal.4th at p. 1208.)

Carlin next complains that the *McKee II* court reached its conclusion that victims of sex offenses suffer greater trauma than victims of non-sex offenses "without any evidence regarding the trauma caused by non-sex offenses." He claims it is "unclear" whether the medical experts' testimony, which focused on child sexual abuse, "is properly extrapolated to adult victims of sexual offenses" and that the court "cited no evidence regarding the effects of other types of crimes and the trauma suffered by victims of those crimes." The argument lacks merit. First, although one of the medical experts testified specifically about child sexual abuse, the other two testified generally about victims of sexual abuse. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1342-1343.) Second, the evidence that the *McKee II* court relied on included testimony that "[s]exual trauma differs qualitatively from other traumas because of its intrusiveness and long-lasting effects," and that "[d]ysfunction, disassociation and avoidance problems after sexual trauma are unique to sexual abuse and are not seen in victims of physical or other types of abuse." (*Ibid.*)

Carlin next complains that the evidence in *McKee II* concerning differences in diagnoses, treatment, compliance, and success rates between SVP's as opposed to MDO's and NGI's did not support "the need to eliminate periodic jury trials, the need to shift the burden of proof, or the need to impose indeterminate commitments." He argues that (1) the *McKee II* court conducted a substantial evidence rather than a de novo review, (2) that treatment is not actually required before an SVP may be eligible for release, and (3) that the court failed to consider whether indeterminate commitments (as opposed to less restrictive five-year commitments) were necessary. We find these arguments unpersuasive. We have already determined that the *McKee II* court conducted a proper de novo review in accordance with the *McKee I* court's directions. (*Ante*, pp. 10-12.) The court concluded that there was substantial evidence to " 'support[] the conclusion

17

that, as a class, SVP's are clinically distinct from MDO's and NGI's and that those distinctions make SVP's more difficult to treat and more likely to commit additional sexual offenses than are MDO's and NGI's.'" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.)

With respect to Carlin's assertion that treatment is not a requirement for an SVP's release and to the extent conflicting evidence on that question was introduced at trial in *McKee*, the prosecution's burden was to show that "the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not [that] they are incontrovertible or uncontroversial." (*McKee I, supra,* 47 Cal.4th at pp. 1210-1211; accord, *McKee II, supra,* 207 Cal.App.4th at p. 1348.) The prosecution satisfied that burden by presenting expert testimony and studies supporting the *McKee II* court's finding that the treatment of SVP's differs significantly from the treatment of MDO's and NGI's and that SVP's are less likely to participate in treatment.

Finally, we are not persuaded by Carlin's argument that indeterminate commitment is not necessary to further the state's compelling interest in protecting the public and providing treatment to SVP's because a five-year term would equally effectuate those interests. The *McKee II* court concluded after a proper strict scrutiny analysis that the state's disparate treatment of SVP's (specifically, an indeterminate-term commitment with a greater burden to obtain release than that imposed on MDO's and NGI's) was necessary to further the state's compelling interests. Narrow tailoring to serve a compelling state interest does not require exhaustion of every conceivable alternative. (See *Grutter v. Bollinger* (2003) 539 U.S. 306, 339.)

### C. Section 6608, Subdivision (a)

Relying on *People v. McCloud* (2013) 213 Cal.App.4th 1076 (*McCloud*), Carlin contends that section 6608, subdivision (a) violates his right to equal protection. Section 6608 governs petitions for conditional release or unconditional discharge that are filed

without the recommendation or concurrence of the Director of State Hospitals. It provides that the trial court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (§ 6608, subd. (a).) Carlin argues that this provision violates equal protection because similarly-situated individuals (specifically, MDO's and NGI's) "are not subjected to having a court deny their petition for release without a hearing." The Attorney General responds that Carlin's challenge is not ripe for review and in any event, section 6608 does not violate equal protection principles. We agree that Carlin's challenge is not ripe for decision.

It is a "well-settled rule that courts should 'avoid advisory opinions on abstract propositions of law. [Citations.]'" (*People v. Ybarra* (1988) 206 Cal.App.3d 546, 549; *People v. Gonzales* (1994) 29 Cal.App.4th 1684, 1700.) To avoid advisory opinions, courts must wait until a case "'has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.'" (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171.)

Carlin's appeal in this case is from a determination made under the SVPA's initial commitment procedures (§§ 6601-6604), not from a determination made under section 6608's post-commitment release procedure. Nothing in the record suggests that Carlin ever filed a petition pursuant to section 6608 for conditional release or unconditional discharge. His equal protection challenge to section 6608 is premature.

*McCloud* does not change our analysis. In *McCloud*, the court remanded an SVP's appeal from a commitment determination "so that both parties may fully brief and argue McCloud's claim that section 6608, subdivision (a), violates the equal protection clause." (*McCloud*, *supra*, 213 Cal.App.4th at p. 1088.) Carlin's reliance on *McCloud* is misplaced for two reasons. First, the decision contains no discussion of ripeness, which suggests that the issue was not before the court. Second, the decision is not on the merits. The court wrote only that it could not say "as the People would have us do" that

19

McCloud's argument was "wholly without merit." (*Id*. at p. 1088.) It remanded the question for further briefing. (*Ibid.*) Thus, even if we were bound by another appellate court's decision, *McCloud* would not control the outcome of this case.

### D.  Claimed Due Process Error in Refusing to Consider Conditional Release

Carlin contends that the trial court erred by failing to consider whether he should be placed in a conditional release program. He further contends that the trial court's error violated his right to due process. We disagree.

Carlin's argument is based on his assertion that the court's statements "indicate" that it "failed to make the required finding that confinement was necessary instead of conditional release . . . ." The record does not support his claim.

During colloquy toward the end of trial, Carlin's counsel informed the trial court that the parties had agreed "early on" to use CALJIC No. 4.19 instead of the relevant CALCRIM instruction. The court responded that it would "definitely look at the instructions." The court noted that CALJIC No. 4.19 had been cited with approval in other cases as an adequate description of the law. Before announcing its ruling, the court told the parties that it "was guided, of course, by CALJIC 4.19 because it is good law."

The version of CALJIC No. 4.19 in effect at Carlin's 2012 trial provided in pertinent part that "[t]he term 'sexually violent predator' means a person who, (1) has been convicted of a sexually violent offense against two or more victims, and (2) has a diagnosed mental disorder, (3) the disorder makes him or her a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior [*unless confined within a secure facility*] . . . . [¶] The word 'likely' as used in this definition means the person presents a substantial danger, that is, a serious and well-founded risk that he or she will commit sexually violent predatory crimes if free in the community. However, it does not mean that it must be more probable than not that there will be an instance of re-offending." (CALJIC No. 4.19 (Spring 2012 ed.), italics added.)

20

The use notes characterize the italicized language as requiring a determination that custody in a secure facility is "necessary" to ensure that the SVP is not a danger to the health and safety of others. (Use Note to CALJIC No. 4.19, p. 249.)

Here, the trial court found that Carlin qualified as an SVP. On the record before us, that finding included an implied finding that Carlin's confinement "within a secure facility" was necessary. (CALJIC No. 4.19.) We reject Carlin's contention that the trial court failed to make that finding.

In ordering Carlin committed to the custody of the DSH, the trial court followed the SVPA's mandate. Section 6604 provides in pertinent part that "[i]f the court or jury determines that the person is a sexually violent predator, the person *shall be committed* for an indeterminate term to the custody of the [DSH] for appropriate treatment and confinement in a secure facility . . . ." (§ 6604, italics added.) "Absent any indicia of a contrary legislative intent, the word 'shall' is ordinarily construed as mandatory . . . ." (*People v. Hardacre* (2001) 90 Cal.App.4th 1392, 1398.) Construing the word "shall" in section 6604 as mandatory is consistent with the Legislature's intent because the SVPA's "primary purpose is to protect the public from 'a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders [that] can be identified while they are incarcerated.' [Citation.]" (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1192.)

Here, having found beyond a reasonable doubt that Carlin qualified as an SVP, the trial court properly ordered him committed to the custody of the DSH. The statute did not give the court discretion to grant Carlin's impromptu petition for conditional release. (§ 6604.) Thus, the court did not err in rejecting it. It follows that there was no due process violation. (*People v. Osband* (1996) 13 Cal.4th 622, 675 ["Because there was no state law error, neither was there any predicate for a constitutional violation."].)

### E. Due Process Challenge to Section 6604

Carlin contends that "the application of section 6604 violates due process" because it gives the trier of fact only two options at the initial SVP commitment proceedings, confinement in the state hospital or unconditional release. He argues that there is no compelling state reason why conditional release (which is an option at recommitment proceedings under section 6608) should not also be an option at initial commitment proceedings under section 6604. We disagree.

A similar argument was rejected in *People v. Grassini* (2003) 113 Cal.App.4th 765 (*Grassini*).) After the trial court found probable cause to believe that Grassini qualified as an SVP, his counsel told the court that Grassini would admit the petition if he could be placed immediately into CONREP. (*Id.* at p. 779.) Counsel asserted that the trial court had the inherent authority to achieve justice by providing for the least restrictive alternative appropriate to Grassini's and the community's needs. (*Ibid.*) The trial court ruled that it had no authority to order Grassini into CONREP because the SVPA required that SVP's be confined in a secure facility for at least one year before conditional release could be considered. (*Ibid*.) Grassini appealed.

The Court of Appeal found Grassini's contention "without merit." (*Grassini*, *supra*, 113 Cal.App.4th at p. 779.) It refused to "read into [section 6604] the provision that confinement and treatment for two years in a secure facility are required only for an SVP 'who is likely to engage in sexually violent criminal predatory acts while [under] supervision and treatment in the community.'" (*Grassini*, at p. 780.) It relied in part on *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888 (*Ghilotti*), which rejected the notion that due process limited involuntary confinements to persons found "'more likely than not'" to reoffend. It quoted the California Supreme Court's statement in *Ghilotti* that "[i]n our view, the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control

22

their violent sexual impulses, represent a *substantial danger* of committing similar new crimes [citations], even if that risk cannot be assessed at greater than 50 percent. The SVPA is narrowly tailored to achieve this compelling purpose. [Citation.]" (*Grassini*, at p. 780, quoting *Ghilotti*, at p. 924.)

The *Grassini* court also relied on *People v. Hubbart* (1999) 19 Cal.4th 1138 (*Hubbart*), noting that in that case, "the [California] Supreme Court pointed out that '[t]he Legislature . . . evidently determined that because SVP's have committed sexually violent offenses in the past and are dangerous at the time of commitment, they should receive treatment in a secure psychiatric facility suited to addressing the special risks they present. [Citations.]' [Citation.] 'In describing the underlying purpose [of the SVPA], the Legislature expressed concern over a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes. The Legislature indicated that to the extent such persons are currently incarcerated and readily identifiable, commitment under the SVPA is warranted immediately upon their release from prison. The Act provides treatment for mental disorders from which they currently suffer and reduces the threat of harm otherwise posed to the public. . . . [Citation.]'" (*Grassini*, *supra*, 113 Cal.app.4th at pp. 780-781, quoting *Hubbart*, at pp. 1143-1144.)

The *Grassini* court noted that "[t]o this end, the statutory scheme provides for confinement of SVP's until they no longer pose a threat to society, thereby employing the least drastic method of attaining its purpose of the protection of society. (See *Hubbart*, *supra*, 19 Cal.4th at pp. 1177-1178, fn. 36 [conditional release provisions constitute less restrictive alternatives]; see also *People v. Cheek* (2001) 25 Cal.4th 894, 898 ['The [SVPA] is . . . "designed to ensure that the committed person does not 'remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness.'"'].) As the Supreme Court observed in *Hubbart*, 'Various provisions

23

seek to ensure that any commitment ordered under section 6604 does not continue in the event the SVP's condition materially improves. . . . [A]t any time the [DSH] has reason to believe that a person committed under the [SVPA] "is no longer a sexually violent predator," judicial review of the commitment must be sought. [Citation.] If the court accepts this recommendation, the person is entitled to unconditional release and discharge.' In addition, under section 6605, an SVP 'shall have a current examination of his or her mental condition made at least once every year' [citation], and, after a finding by the court of probable cause to believe that the mental disorder has changed, the SVP shall be unconditionally released and discharged if the state fails to prove beyond a reasonable doubt at a trial that the SVP's diagnosed mental disorder 'remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged.' [Citations]" (*Grassini*, *supra*, 113 Cal.App.4th at p. 781.) The *Grassini* court additionally noted that section 6608 allows an SVP to petition for conditional release from confinement even without the concurrence of the DSH, "and this may be followed by unconditional release after a year in such program. [Citation.]" (*Grassini*, at p. 781.) The court concluded that there was "no due process violation in the trial court's rejection, under the statutory scheme, of [Grassini's] proposed plea bargain involving immediate outpatient commitment." (*Id.* at p. 782.)

We find the *Grassini* court's reasoning persuasive. The state has a compelling interest in protecting the public by confining persons who, like Carlin, "have already been convicted of violent sex offenses, and . . . as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes . . . ." (*Grassini*, *supra*, 113 Cal.App.4th at p. 780.) Although the SVPA has been amended since *Grassini* was decided, it remains narrowly tailored to achieve that end, with numerous provisions that ensure that the SVP remains committed only so long as his or her diagnosed mental disorder creates a danger to the community. (E.g., § 6605, subd. (c) [requiring DSH to

24

seek judicial review of an SVP's commitment "[i]f the [DSH] has reason to believe that [the] person committed to it as a sexually violent predator is no longer a sexually violent predator . . . ."], § 6607 [requiring DSH to forward report and recommendation for conditional release to the court and others if the Director determines "that the person's mental disorder has so changed that the person is not likely to commit acts of predatory sexual violence while under supervision and treatment in the community" and requiring the court to set a hearing], § 6608 [allowing an SVP to petition for conditional release even without the concurrence of the DSH].) We reject Carlin's argument that the application of section 6604 violated his due process rights.

Carlin maintains that *Grassini* is inapposite "because of the different factual circumstances" between that case and this one. He emphasizes that he had been in the custody of the DSH "for over twelve years by the time the trial court found the [SVP] petition true." This argument overlooks the fact that he refused treatment for most of those 12 years. He did not begin treatment until 2010. He had not yet completed Phase II when the trial court found the petition true. Thus, his circumstances were not materially different from Grassini's.

Carlin argues that *Grassini* is distinguishable because it involved a plea bargain. This is a distinction without a difference. The issue was the same in both cases: whether the failure to consider initial placement in a conditional release program in the community, rather than commitment to the state hospital, violated due process.

Carlin next asserts that "[t]he California Supreme Court has found that treatment does not necessarily require confinement." The high court's observation does not advance his argument. The statement comes from *Ghilotti*, which involved a petition to recommit an SVP despite the formal recommendations of two DMS-designated psychologists that he should be unconditionally released because he no longer met the statutory definition of an SVP. (*Ghilotti*, *supra*, 27 Cal.4th at p. 926.) The prosecution argued that the statute did not permit the evaluators to recommend Ghilotti's

25

unconditional release without finding that he was "'safe *in the absence of any treatment and custody.*'" (*Id.* at pp. 925-926.) The court rejected that argument, holding that "insofar as the protocol permits, the evaluators may consider any factor which, in their professional judgment, is relevant to the ultimate issue whether the person is a substantial danger to reoffend if free in the community without any conditions, supervision, monitoring, or mandatory treatment in the Director's custody." (*Id.* at p. 927.) "Particularly when one, like Ghilotti, has previously been committed as an SVP, and thus has already been subject, while in hospital confinement, to the SVPA's mandated treatment program [citation], the evaluators may obviously assess his or her progress, if any, as a factor in determining whether he or she represents a substantial danger if unconditionally released at the end of a commitment term. Theoretically this might include an assessment that while a continuing mental disorder makes it dangerously difficult for the person to control his or her violent sexual impulses without continuing treatment, there is practicable treatment, readily available in the community, which would eliminate or control the impulses, and the person's current mental condition is such that he or she can be, and is, willing and able to pursue such treatment as long as it is needed. There appears no statutory reason why the evaluators may not consider these factors as bearing on the overall assessment of the person's risk of reoffending if free of custody." (*Ghilotti*, at p. 927.)

Carlin's circumstances are different. He was not before the court on a petition for recommitment. Neither of the designated DHS evaluators recommended his unconditional release. Neither evaluator suggested that he could be safely treated in the community. On the contrary, Dr. Korpi testified that voluntary treatment "at this point would not be prudent" because Carlin was "too new to treatment." Dr. Owen testified that Carlin needed "to continue in the phases . . . so he reduces his risk for reoffending." Carlin's reliance on the high court's observation in *Ghilotti* is misplaced. His reliance on a statement that the court made in *People v. Superior Court* (*George*) (2008) 164

26

Cal.App.4th 183 (which Carlin also quotes out of context) is misplaced for the same reasons.

### III.  Disposition

The order committing Carlin to the custody of the DSH for an indeterminate term is affirmed.

_____
Mihara, J.

WE CONCUR:


_____
Elia, Acting P. J.



_____
Bamattre-Manoukian, J.